687 A.2d 274

THOMAS TRANTINO, APPELLANT, v. NEW JERSEY STATE PAROLE BOARD, NEW JERSEY DEPARTMENT OF CORRECTIONS AND DONALD LEWIS, SUPT., RESPONDENTS.

THOMAS TRANTINO, APPELLANT, v. NEW JERSEY STATE PAROLE BOARD AND NEW JERSEY DEPARTMENT OF CORRECTIONS, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 17, 1996—Decided January 15, 1997.

438

Before Judges PRESSLER, STERN and HUMPHREYS.

*Roger Lowenstein* argued the cause for appellant (*Edward A. Jerejian,* on the brief; *Mr. Lowenstein,* on the supplementary brief).

*Howard J. McCoach* and *Dianne M. Moratti,* Deputy Attorneys General, argued the cause for respondents (*Joseph L. Yiannotti* and *Mary C. Jacobson,* Assistant Attorneys General, of counsel; *Jennifer L. Kleppe, Mr. McCoach, Ms. Moratti* and *Andrew R. Sapolnick,* Deputy Attorneys General, on the brief; *Mr. McCoach,* on the supplementary brief).

The opinion of the court was delivered by

STERN, J.A.D.

Thomas Trantino was convicted of murder in 1964 and sentenced to die. The conviction was affirmed on direct appeal. *State v. Trantino,* 44 *N.J.* 358, 209 *A.*2d 117 (1965), *cert. denied,* 382 *U.S.* 993, 86 *S.Ct.* 573, 15 *L.Ed.*2d 479 (1966), *reh'g denied,* 383

*U.S.* 922, 86 *S.Ct.* 901, 15 *L.Ed.*2d 679 (1966). While our Supreme Court has found that Trantino "killed two police officers in 1963," *In re Trantino Parole Application,* 89 *N.J.* 347, 352, 446 *A.*2d 104 (1982), and that "Trantino was guilty of two murders," *id.* at 375, n. 9, 446 *A.*2d 104, it is undisputed before us that the indictment alleged only one count of murder and that only one sentence for murder was imposed.[1] Thus, when the Supreme Court invalidated the statute under which the death penalty for first degree murder was imposed, *N.J.S.A.* 2A:113–4 (now repealed), Trantino's death penalty was converted to a single sentence of life imprisonment. *State v. Funicello,* 60 *N.J.* 60, 286 *A.*2d 55 (1972), *cert. denied, sub. nom. New Jersey v. Presha,* 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972). Under the Supreme Court's mandate, Trantino was "sentenced to life imprisonment, *nunc pro tunc,* as of the date the life sentence was initially imposed, the defendant to be entitled to the same credits as if initially sentenced to life imprisonment." *Id.* at 67–68, 286 *A.*2d 55. As a result of that sentence, "Trantino became eligible for parole in 1979," *Trantino Parole Application, supra,* 89 *N.J.* at 352, 446 *A.*2d 104, because a person sentenced to life imprisonment under *N.J.S.A.* 2A:113–4 was eligible for parole after twenty-five years less commutation time and work credits. *N.J.S.A.* 30:4–123.11 (repealed).

This appeal deals principally with the Parole Board's April 1996 decision to deny Trantino parole and to fix a future parole eligibility date (FET) of ten years hence.

## I.

The facts regarding the brutal slayings of Sergeant Peter Voto of the Lodi Police Department and police trainee Gary Tedesco

---

[1] We requested a copy of the judgments originally entered in addition to those entered after Trantino's death penalty was vacated. We did so to ascertain whether he was subject to one life sentence or two and, if the latter, whether they were concurrent or consecutive. The subject is relevant to the sentence before the Parole Board and the sentence which might be imposed for the same crimes under Title 2C. *See Trantino Parole Application, supra.*

are detailed in Chief Justice Weintraub's opinion affirming the conviction:

On the evening of August 25, 1963 Trantino and Frank Falco committed a robbery in Brooklyn, following which they and some companions went to the Angel Lounge, a tavern in Lodi, New Jersey, for pleasure. During the early morning of the 26th, Trantino or someone else fired two shots in horseplay. Sergeant Peter Voto of the Lodi Police Department and Gary Tedesco, a young man who was about to be appointed a patrolman and who accompanied Sergeant Voto for a view of police routine, entered the tavern, presumably to investigate the report of gunfire.

Voto and Tedesco had been in the tavern earlier that morning. On the further visit following the gunfire just mentioned, Voto asked all of the patrons to establish their identity. Following inspection of identifying papers, Voto found a gun wrapped in a towel. Trantino thereupon seized the officer from behind, placed a gun to his head, cursed him and shouted that he would die. He ordered Voto to undress. Voto did so slowly, and as he did Trantino struck him repeatedly with the gun, forcing him to his knees. When Tedesco, who had gone out for a searchlight, re-entered, he was seized by Falco. Tedesco too was ordered to undress, and he did promptly. With Voto partially undressed and on the floor, almost unconscious from the blows, and with Tedesco stripped to his shorts, Trantino fired a number of shots at both, killing them almost instantly. There was testimony that Falco shouted to Trantino, "You're crazy. What are you doing? You're crazy," to which Trantino replied, "We are going for broke. We are burning all the way. We are going for broke."

Trantino and Falco fled, both returning to New York City. Falco was killed there a few days later by police officers who were trying to apprehend him. Trantino surrendered to New York authorities and was extradited to this State.

The resume of events given above was the State's version of the murders. In his defense Trantino testified that on the 25th he took two dexedrine pills and consumed a considerable quantity of liquor from the afternoon of that day to the time of the homicides on the 26th. He denied any recollection of the slaying of the officers, saying he recalled only a loud explosion, followed by a confusion of wild sound and light within which Falco appeared to be a devil with arched eyebrows. He claimed he next recalled entering the car of a Mrs. Norma Jaconnetta (she left the tavern hurriedly after the shooting) and leaving the car with Falco when she was unable to start it. He related a frenzied flight to the home of a Mrs. Patricia MacPhail (she too had been at the Angel Lounge and had left just before the officers were shot), and described the drive with her help to New York. He insisted those events were heavily clouded.

Although Trantino thus disavowed awareness of the homicides, Mrs. MacPhail testified he told her the policemen were killed, at first saying that Falco had killed them and later saying during the ride to New York City that it was he, Trantino, who had slain them and that he did so to help Falco who was wanted for murder in New York.

[*State v. Trantino, supra,* 44 *N.J.* at 361–63, 209 *A.2d* 117.]

The insanity defense was rejected at trial, and the Supreme Court questioned the sufficiency of the proofs to support its consideration. *Id.* at 367, 209 *A*.2d 117. The opinion noted that the diagnosis of defendant's expert "was sociopathic-personality disturbance, drug and alcoholic addiction with emotional instability, and depressive reaction, situational in character." *Id.* at 365, 209 *A*.2d 117. The facts regarding the murder, the diagnosis and Trantino's denial of recollection at trial each have significance with respect to the decision of the Parole Board before us.

## II.

In 1980, Trantino was granted parole with restitution imposed as a special condition. However, the Law Division refused to set the amount of restitution in a murder case, and a number of issues had to be resolved in light of the adoption of the Parole Act of 1979, *N.J.S.A.* 30:4–123.45 *et seq., L.* 1979, *c.* 441, § 1 *et seq.,* which had taken effect. In *Trantino Parole Application, supra,* the Supreme Court interpreted the Parole Act of 1979, a provision of which provides that inmates sentenced to life imprisonment pursuant to *N.J.S.A.* 2A:113–4 were not to be eligible for parole as provided in the new Act. Rather, their parole eligibility was to be computed pursuant to the 1948 Parole Act, *N.J.S.A.* 30:4–123.1 *et seq.* (repealed), which was in effect at the time of the murders committed by Trantino. *See N.J.S.A.* 30:4–123.51(j).

In *Trantino Parole Application, supra,* the Court analyzed the impact of the Parole Act of 1979 with respect to Trantino as a Title 2A offender and the decision to parole Trantino. The Court concluded that restitution could be imposed as a condition of parole for an inmate convicted of homicide based on specific criteria, *id.* at 361, 446 *A*.2d 104, but that the Parole Board imposed restitution as a condition of parole in Trantino's case based on standards which were "much too imprecise and broad." *Id.* at 363, 446 *A*.2d 104. Because "[t]he imposition of restitution as a parole condition in [Trantino's] case was not an independent, severable or free-standing factual determination made by the

Board," *id.* at 364, 446 *A.*2d 104, the Supreme Court concluded that "modification of the Board's imposition of restitution as a condition of parole puts an entirely different cast upon its ultimate determination that there is no substantial likelihood that Trantino will commit future criminal acts if released" and determined that the Board had "the right to reconsider and redetermine" its prior determination. *Id.* at 364–65, 446 *A.*2d 104. According to Justice Handler's opinion for the Court, "[a] new development or new evidence relating to established facts or a material misapprehension concerning an essential matter which is critical to an agency determination can constitute a reasonable basis for reconsideration by the agency." *Id.* at 365, 446 *A.*2d 104. The Court therefore remanded the matter to the Parole Board "to reconsider and redetermine Trantino's fitness for parole." *Id.* at 377, 446 *A.*2d 104.

The Court also addressed the standards to be applied by the Board for purposes of making parole decisions with respect to Title 2A offenders following adoption of the Parole Act of 1979. The Court emphasized the difference in approach to the subject of sentencing and parole under Title 2A and 2C, the latter of which was adopted effective September 1, 1979. *N.J.S.A.* 2C:98–4. Justice Handler explained that the 1979 Parole Act limited Parole Board discretion and embodied presumptive parole (which took into account the punitive aspects of the sentences set by the Court). *Id.* at 368–70, 446 *A.*2d 104; *see also N.J.S.A.* 2C:43–6, 2C:43–7; *N.J.S.A.* 30:4–123.51. Under Title 2C, the judicial determination embodies the punitive aspects of the sentence and "[t]he parole decision must be confined solely to whether there is a substantial likelihood for a repetition of criminal behavior." *Trantino Parole Application, supra,* 89 *N.J.* at 369, 446 *A.*2d 104. However, the Court further explained that the same approach was not applicable under the Parole Act of 1979 for a Title 2A offender. As noted, the 1979 Act saved from repeal the 1948 Act for purposes of parole consideration relating to Title 2A offenders. *N.J.S.A.* 30:4–123.51(j); *see also N.J.S.A.* 30:4–123.11 (repealed). According to the Court:

Thus, for an inmate, such as Trantino, sentenced to life imprisonment, the parole eligibility date arose after 25 years, "less commutation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments." Nevertheless, substantive parole determinations regarding such inmates are to be made by applying the new Act's parole fitness standard. *N.J.S.A.* 30:4–123.46. Viewed in this light, the difference between these two classes of inmates—those sentenced pre-Code and those sentenced post-Code—becomes glaringly apparent. Inmates serving sentences under the Code—post-Code inmates—will have presumptively satisfied all punitive aspects of their sentences at the time they become eligible for parole. This is not true of pre-Code inmates. The punitive aspects of their sentences will not necessarily have been fulfilled by the time parole eligibility has occurred.

[*Trantino Parole Application, supra,* 89 *N.J.* at 369–70, 446 *A.2d* 104.[2]]

The Court continued:

Contrary to Trantino's assertions, the Parole Act does not prevent consideration of the punitive aspects of a pre-Code inmate's sentence as they relate to the rehabilitative prospects of the inmate and his likelihood of recidivism if released.... Hence, the punitive aspects of a sentence are extremely relevant in terms of the inmate's rehabilitation.

... We now hold that, at least with respect to pre-Code sentenced inmates such as Trantino, while the Parole Board may not determine parole release or fitness solely on grounds of the adequacy of the punishment reflected in the inmate's prison term, the Board must consider whether the punitive aspects of a sentence have been satisfied in terms of the rehabilitative potential of the inmate. Thus, on remand in this case, the Board must reassess the punitive aspects of Trantino's sentence in considering the extent of his rehabilitation and his fitness for parole.

On this critical point it is necessary to underscore the gravity of Trantino's underlying crimes since the seriousness of the offense is the main factor that creates the need for punishment.... While the gravity of the crime may not now be considered an independent reason for continuing punishment and denying parole, the Parole Board must nevertheless weigh the seriousness of the crime as an element in determining whether the offender's punishment has been adequate to insure his individual progress toward rehabilitation.

. . . .

In considering Trantino's fitness for parole release, the egregiousness of his crime and the harsh sentence imposed obligate the Parole Board to weigh most scrupulously and conscientiously whether Trantino has been punished sufficiently

---

[2] It appears that the Court decided to treat Trantino the same as any convict sentenced to life imprisonment under Title 2A, even though the parole provisions relating to life sentences for murder under pre-Code law, pursuant to *N.J.S.A.* 30:4–123.11 (repealed), were premised upon the jury's rejection of the death penalty and "recommend[ation of] life imprisonment."

for it to conclude with confidence that he has been rehabilitated and will not commit future crimes. Furthermore, in this regard it cannot be claimed that pre-Code inmates such as Trantino are being treated unfairly in comparison to inmates sentenced under the Code. If Trantino had been convicted and sentenced under the Code, it is almost certain he would not yet be eligible for parole and probably would not become eligible for many years to come.

[*Id.* at 369–75, 446 A.2d 104 (citations omitted).]

Thus, the Third Circuit has concluded that *Trantino Parole Application, supra,* requires the Parole Board to "consider both the likelihood of recidivism and whether the punitive aspects of [Trantino's] sentence have been satisfied." *Royster v. Fauver,* 775 *F.*2d 527 (3d Cir.1985).

After the Supreme Court remanded the case to the Parole Board in 1982, the Board imposed a ten year FET which, considering work credits and good time, made him eligible for parole again in 1988. What happened at that time is not detailed in the record, but it appears from Trantino's brief and the transcripts of the 1993, 1994 and 1995 parole hearings before us, that although initially recommended for parole by a panel in 1988, he ultimately received a six year FET from the full Board. We affirmed the denial of parole in an unpublished opinion and affirmed the Board's action based on its conclusions "that rehabilitation has not been sufficiently achieved and that, therefore, the punitive aspects of Mr. Trantino's sentence have not been satisfied" and "that there also exists a substantial likelihood that Mr. Trantino will commit a crime under the laws of this State if released on parole at this time."

Subsequently on September 18, 1991, the full Parole Board again denied parole and set a thirty-six month FET. The Board, however, recommended that the Department of Corrections (DOC) "place Mr. Trantino in a 1/2 way house," so that the Board could ultimately "evaluate his behavior in a less structured environment." The Board also recommended that Trantino "continue to maximize his participation in psychological counseling." These

determinations are not before us on this appeal.[3]

### III.

Trantino now appeals from subsequent determinations including the Parole Board's 1996 decision to deny him parole and to establish a future parole eligibility date ten years hence. He also appeals from the denial by the Law Division of his petition for *habeas corpus.* According to Trantino:

> Before this court are appellants [*sic*] appeal from the 1993 Adult Panel hearings, resulting in the decision of December 17, 1993, affirmed on April 26, 1995 by the full Board; if necessary, the September 1, 1994 hearing resulting in the decision of April 17, 1995, affirmed by the full Board on September 26, 1995; if necessary, the hearing of September 14, 1995 resulting in the decision of September 25, 1995. Also before this Court, again only necessary if appellant does not prevail on his challenge to the December 17, 1993 decision, is the [Department of Corrections (DOC)] denial of transfer to a halfway house on January 2, 1994. Also before this court is the issue of whether the state habeas corpus statute, *N.J.S.A.* 2A:67–1, is an appropriate vehicle, under the facts of this case, for resolution of these disputes.

The Board and DOC claim that the appeal from the 1993 and 1994 decisions are moot and irrelevant by virtue of the subsequent Parole Board hearings and decisions.

In September 1995 a two-member panel of the Board denied Trantino parole and recommended another extended FET beyond the guidelines. The matter was therefore referred to a three person panel. *N.J.A.C.* 10A:71–3.21(d). The third member questioned Trantino extensively at a hearing conducted on December 11, 1995. However, the matter was referred to the full Board because of the lack of unanimity of the three person panel

---

[3] According to the transcript of the September 14, 1995 hearing, Trantino received "a one year hit, a one year hit, a ten year hit, a six year hit, a 36 month hit [and] another 36 month hit." The denial of parole by a panel is appealable to the Board. *N.J.S.A.* 30:4–123.55(d), –123.58. If the panel votes to grant parole of someone convicted of murder, the full Board must approve the recommendation. *N.J.S.A.* 30:4–123.55(f). When a two-person panel believes a FET beyond the guidelines is required, a three-member panel must be convened. *N.J.S.A.* 30:4–123.56(a), (b); *N.J.A.C.* 10A:71–3.21(c), (d). These requirements explain why certain decisions were made by two member or three member panels, or the full Board.

regarding the extended FET. *N.J.A.C.* 10A:71–3.21(d). On April 3, 1996, the Board set a ten year FET. The decision was based on psychological evaluations of Trantino conducted by James Bell, a psychology consultant, and Glenn Fergusson, an MA, who were interviewed by the Board concerning their evaluations. The Board was impressed by the fact that Trantino does not take responsibility for the shootings, evidenced by his assertion to Bell that Frank "Falco shot both victims, that [he] did not discharge a gun, and that [he] left the bar before anyone was shot." The Board expressed concern that Trantino "claimed at [his] parole hearing on September 14, 1995 that [he] could not remember details of the shooting, but [he] did remember minute details of events both before and after the murders." Thus, the Board found that "further counseling" was essential "to gain insight into [his] role in the crimes." In its May 20, 1996 written decision confirming the April 3, 1996 determination, the Parole Board concluded:

It is clear to the Board that despite the program participation completed by you during the years of your incarceration you still have not gained sufficient insight into your role in these crimes. Therefore, you have not achieved your rehabilitative potential and the punitive aspects of your sentence have not been satisfied and there is substantial likelihood that you would commit a crime if released on parole. Therefore, the Board believes the ten year future eligibility term is necessary in order to provide you with the opportunity to participate in appropriate psychological counselling to address your lack of responsibility and insight.

The Board emphasized its standard of review in light of the Supreme Court's prior recognition that the Board's " 'obligation to scrutinize the adequacy of Trantino's punishment in relation to his progress toward rehabilitation should be regarded as a continuing one.' " *Trantino Parole Application, supra,* 89 *N.J.* at 375, 446 *A.*2d 104. The Board noted that there was no presumptive parole for a 2A offender, that the critical issue relating to potential lack of recidivism was to be evaluated by deciding if the inmate had reached his "rehabilitative potential," that Trantino had not, and that the future eligibility term was, therefore, required.

Before us, the Board argues that the Supreme Court's prior opinion requires a *de novo* review at each parole hearing and on that review, it is obligated to

determine if the punitive aspects of Trantino's sentence have been satisfied such that he is truly rehabilitated and is not likely to commit crimes in the future. On this point—the sufficiency of punishment—the Parole Board may consider the kind of sentence that the inmate would likely have received under the present Code of Criminal Justice for the crimes which he committed.

[*Trantino Parole Application, supra,* 89 *N.J.* at 377, 446 *A.*2d 104.]

Referring to the prior *Trantino Parole Application* opinion, the Board notes the language of Justice Handler that "[i]f the Board determines that Trantino has not been punished sufficiently and, for that reason, as well as any others, it appears by a preponderance of the evidence that there is a substantial likelihood of future criminal activity if he is released, the Parole Board *must* deny parole." *Id.* at 377, 446 *A.*2d 104 (emphasis added).

The Parole Board acknowledges that the federal Constitution (art. I, § 9) would prohibit application of Title 2C parole eligibility standards with respect to parole eligibility for Trantino as a 2A offender.[4] However, it notes that if Trantino were sentenced under the Code of Criminal Justice (Title 2C) to a non-capital sentence at the time of the 1995 and 1996 hearings, he most likely would have received two consecutive sentences with a mandatory thirty years before parole eligibility, *see N.J.S.A.* 2C:11–3b, and that that is a factor to be considered with respect to the sufficiency of punishment even if it is not a factor which can be considered with respect to parole eligibility. The Board further points to Bell's psychological evaluation as constituting new evidence that lengthy psychological rehabilitation is necessary before Trantino can reach his rehabilitative potential, and that in light of Bell's report and Trantino's inconsistent statements concerning his recollection and culpability, the Board's decision was not arbitrary, capricious or unreasonable.

Trantino asserts entitlement to *habeas corpus* and argues that the Law Division erred in not granting the writ. He also contends

---

[4] Application of the Parole Act's procedural provisions and amendments thereto which may affect procedure pose no *ex post facto* issues. *See California Dept. of Corrections v. Morales,* 514 *U.S.* ——, 115 *S.Ct.* 1597, 131 *L.Ed.*2d 588 (1995); *Trantino Parole Application, supra; Royster v. Fauver, supra.*

that the Board acted arbitrarily and capriciously in denying him parole and in fixing a ten year future eligibility date, particularly because a panel of the Board found that he was ready for parole in 1993, conditioned upon satisfactory completion of a residency in a halfway house, and that the DOC arbitrarily deprived him of the opportunity of halfway house placement by declining to transfer him there. The DOC responds by indicating that there was a good faith basis for declining the transfer, because of letters received warning of risks to Trantino and others at such a halfway house (which letters no longer exist). The Board insists that just as frustration of the condition of parole relating to restitution required a *de novo* review in 1982, even assuming that we can consider the 1993 action of the panel, frustration of the recommended condition of halfway house placement requires *de novo* review of the determination of the panel in 1993.

## IV.

In its September 18, 1991 decision establishing a thirty-six month FET, the Board urged Trantino "to make every effort to achieve halfway house status in order for the Board to evaluate his behavior in a less structured environment." Trantino immediately requested transfer to a halfway house in a letter, dated October 9, 1991, to the Superintendent of Riverfront State Prison. Trantino insists that on November 26, 1991, the Riverfront Classification Committee approved his request for transfer to the Camden Volunteers of America. However, on December 31, 1991, he was orally advised that the Prison Superintendent disapproved the request. In a letter dated April 21, 1992, the DOC advised Trantino's attorney that the transfer "was denied placement pursuant to *N.J.A.C.* 10A:20–4.2," the administrative rule by which the Commissioner of the DOC or his designee has the authority to determine an inmate's place of confinement or to transfer an inmate from one place of confinement to another.

Trantino became eligible for parole again in June, 1992. The panel deferred decision until an in-depth psychological evaluation

could be held at Avenel, and thereafter pending an in-person interview with the psychologist who performed the evaluation. On April 2, 1993, a hearing was conducted after which one member of the Panel, Andrew Consovoy, voted to release Trantino on parole and the other, Arthur Jones, voted to deny, believing that halfway house placement was essential to parole for someone incarcerated as long as Trantino. Consovoy was quite critical of the handling of Trantino's case, asserting that "this case has never been treated the same way as any other case" and that, despite the fact there is no right to parole, the case "should be treated on the merits." He insisted that Trantino's progress as a prisoner and his program participation warranted parole because, as he explained to Trantino, "[y]ou've done what you've needed to do, and you've done all you can do," and urged him to take legal action because the halfway house application "cannot be rejected by the Department of Corrections."

Despite a rule requiring a rehearing of a split decision before a three-member panel, *see N.J.A.C.* 10A:71–1.3(f), the Panel members subsequently "administratively reviewed" the April 1993 decision and determined to reconsider the decision. On November 12, 1993, another hearing was conducted before the same two-member panel. At that hearing both Mr. Consovoy and Mr. Jones were critical of the fact Trantino was not placed in a halfway house. According to Consovoy, the criticism of concern to the DOC "appears to be quite localized to Bergen County . . . and to certain radio shows that seem to talk to those folks" and was irrelevant to Trantino's placement in Camden. Jones stated:

> I said I want to see you in a halfway house as an inmate before release. I think the Department of Corrections owe that to you. Okay? Based on their own standards. Based on a rehabilitative program and mode for inmates that have been incarcerated ten years, fifteen years, twenty years, thirty years, as yourself, there should be no other release method other than the gradual release process, where an inmate can gain a sense of identity, dignity and money in their pocket before they get out there.
>
> Other than that, they're setting you up for a failure. In your case they would have set you up to go out where you're totally dependent upon your wife. You know? Almost totally dependent on your wife.

That is no dignity for a man or for a woman to have to be totally dependent upon another person.

And the other two is, I said the out-of-state parole plan was the best plan that I've seen that any inmate had had. Okay? The out-of-state plan they denied you because of what I felt is a right being denied to you by this Department of Corrections.

So the two of those together, I will contend that the two-way punitive aspect had not been satisfied based on one and two. Work release and the parole plan.

The parole plan—the second parole plan that you—that you presented, I don't feel is capable or realistic of being accomplished, because I think it's going to put too much pressure on you, it's going to put too much pressure on your wife.

I would not want to see you in that. I could not vote for release to that type of a plan. And this is what I've contended all along.

. . . .

And I would want that type of plan in place for me or for you or your son or for my son. And that has been the ball of my contention with your case. Not you per se, but with your case. And I will go on record as saying that with all of the times that you have been in minimum custody and all of the work that you've done inside the institution, all the programs, there is clearly no reason why you should not be in work release or a halfway house.

The panel also agreed that they saw no written reasons for the denial of halfway house status and that Trantino's halfway house application was not denied in a proper manner. Consovoy then announced the panel's decision to deny parole and impose a thirty-six month FET because the DOC would not grant Trantino halfway house status. They also recommended that Trantino file suit against the DOC. According to Consovoy:

Mr. Trantino, as you know the last time Mr. Jones and I saw you we had a split decision. We have reconciled that split in the following manner. I am voting for your (indiscernible) to be granted, as Mr. Jones is. On a very, very limited basis. We want (indiscernible) to be resolved, and I want you to resolve them.

. . . .

If the Court tells us that in your case or any other case we cannot—especially in a 2A case, we cannot demand a halfway house placement as a pre-condition to parole approval, then frankly the board has to deal with it as it is.

And in my opinion, in the setting you're in and it's also the opinion of the professionals that have evaluated you the last two times, that you have, in fact, reached your rehabilitative potential. Any inmate who's reached his rehabilitative potential on a gratuity sentence must be paroled whether we want to or not.

But in this situation—you see, Tom, there is no legal reason for them to deny halfway house. We've been through that. You meet every criteria. I suggest you follow it. That you take this matter where it belongs, and I believe this matter belongs before the judicial body to referee the tug-of-war between the parole board and the DOC.

. . . .

But it's come—Tom, it's come to the end. You've done your 30 years. You've done every program you can. You achieved full-minimum status, you've had full-time minimum status. If the Courts come back and tell the parole board that we can't do what we're trying to do, then you basically have my (indiscernible) I would to parole you. I can't speak for anybody else. I voted to parole you last time, and you know, people (indiscernible) I think (indiscernible).

This is not what you wanted to hear, and you don't understand this, but this is the best thing that can happen to you. It's got to end. It's got to end before a judge and the judge is going to tell the DOC you're right or they're going to tell the parole board you're right. And then you are on the way to get out.

In its December 17, 1993 "notice of decision" the panel set the thirty-six month FET. In its opinion the panel stated:

Over the years much has been said and written concerning this crime. In the opinion of this panel, this crime can legitimately be called heinous (defined as hateful or shockingly evil). There is no dispute that two (2) unarmed men, one a police officer, were murdered. There is no doubt that Thomas Trantino shot and killed Peter Voto. There is no question that Thomas Trantino set in motion the events that led to the murder of Gary Tedesco, a young man who was not even a police officer. Mr. Trantino is responsible for the deaths of these two men and that issue is forever closed.

In that context, the Parole Board acknowledges that Mr. Trantino has made enormous progress toward reaching his full rehabilitative potential in the 30 years of his incarceration, particularly in the last 5 years. In upholding the Parole Board decision of 1988 to deny parole to Mr. Trantino New Jersey Superior Court, Appellate Division wrote that: 'Two aspects of Trantino's conduct particularly troubled the Board. Although apparently able to remember minute details of events that occurred before and after the shootings, he has never acknowledged that he killed the officers. Also, during his many years in prison he has never undergone drug and alcohol counseling or a long-term course of psychotherapy. Regarding the killings, Trantino initially claimed that he fled from the nightclub before the officers were killed. In recent years he claims that because the evidence against him is overwhelming, he accepts responsibility for killing the officers, but insists that he does not recall having done so.

When the Board last denied Trantino parole in 1982, it urged him to undergo drug and alcohol abuse counseling. When the then Board Chairman met with Trantino in 1985 and urged him to undergo long-term counseling if only to enhance his

chances of parole, Trantino walked out of the meeting. Trantino insists that he does not need counseling.

There is ample evidence in this record to support the Board's concern that Trantino has been distracting himself and others with good works, and seemingly insightful expressions of his past and present condition in order to avoid coming to grips with the fact that he suffers from [ ] serious underlying personality problem that renders him a risk for parole at this time. His refusal to undergo drug counseling or long-term psychotherapy is further evidence of that conclusion.' Mr. Trantino has in his current restricted environment, in our opinion, done his best to address these and other issues identified by the Parole Board, and the most recent professional reports reflect this progress. This panel, therefore, acknowledges that Mr. Trantino *has* reached his rehabilitative potential within the confines of his current state prison setting. However, given the specific facts of this particular case the absolute inability to function in society prior to this crime, even as a supervised parolee; his long and difficult path towards real and not superficial rehabilitation; with his only recently addressing some major issues; and the length of his incarceration. . . . [W]e believe that he cannot be judged to have reached his true and full rehabilitative potential until and unless he has achieved an intensive, therapeutic and rigorously supervised, gradual reintegration into society. In New Jersey, the only present means to achieve this crucial goal is through the placement by the Department of Corrections of Mr. Trantino in a halfway house while still an inmate.

The Parole Board firmly believes that this last and vital step must be attempted before Mr. Trantino could even be considered to be fully rehabilitated and granted parole. Although we believe that it is not unreasonable to conclude that Mr. Trantino has made impressive strides in resolving his problems and internal conflicts that led to these homicides we will only have full knowledge of this man's rehabilitation through the reintegration process of a community based halfway house setting. In that context we can evaluate Trantino's readjustment to societal and not institutional stresses, to societal and not institutional failures, and to societal and not institutional temptations. Only through this process can the Parole Board judge if this man has been truly rehabilitated. The Adult Panel is of the opinion that the placement of Mr. Trantino to a halfway house should be done while he is an inmate to insure the legitimate interests of all parties.[5]

The notice of decision concluded:

The Adult Panel is of the opinion that if Mr. Trantino can successfully enter and complete a correctional halfway house program as an inmate he can achieve his full

---

[5] The briefs do not refer to *N.J.S.A.* 30:4–123.59(d) which authorizes parole to a residential facility funded in whole or part by the State. In the proceedings before us there is discussion of the Board's practice of paroling only after observation of an inmate's conduct and behavior while in halfway house placement, and its opposition to paroling prior to such review. *See N.J.A.C.* 10A:71–3.18(b) (effective February 21, 1995, regarding halfway house placement as a "pre-release condition"). In any event, we are cited to no regulation, and find

rehabilitative potential and therefore will satisfy the punitive aspect of his sentence and meet the substantial likelihood test.

On November 12, 1993, after the hearing before the panel, Trantino sent a letter to the Commissioner of the DOC requesting approval of a transfer to a halfway house which he indicated had been approved by the Riverfront Institutional Classification Committee (ICC). Trantino asserts that he never received a written reply, which the two-member panel later noted to be so, but maintains he was assured of a transfer by interstate compact to a prison in Rhode Island, where his eventual placement in a halfway house would not attract attention. He insists that when news of the transfer plans was reported in the press, political pressure led the DOC to repudiate its commitment.

Trantino wrote to the ICC again on January 11, 1994, to ask for a transfer to a halfway house. The request was "denied" on February 2, 1994 with the "reasons/comments" noted "seen for community release."

Although no clear reasons for the ICC's decision were given to Trantino, a letter from Riverfront Administrator Donald E. Lewis to an investigator for the Internal Affairs unit of the DOC, dated June 2, 1995, reported that:

> On January 28, 1994, inmate Trantino made application for community release with Volunteers of America and Clinton House as his place of preferential assignments. His application was referred to the Institutional Classification Committee, chaired by Donald E. Lewis on February 2, 1994. Mr. Trantino's request for halfway house assignment was discussed, and the committee rejected his request. The denial was is [sic] based upon (2) factors:

---

none, which implements *N.J.S.A.* 30:4–123.59(d). To the contrary, the regulations empower the Commissioner of the DOC to "designate as a place of confinement any available, suitable and appropriate institution or facility whether owned by the State or otherwise," *N.J.A.C.* 10A:20–4.2, and establish eligibility criteria and a review process for residential community release programs. *N.J.A.C.* 10A:20–4.1 *et seq.* The eligibility period is related to an established parole or parole eligibility date. *N.J.A.C.* 10A:20–4.7(a). Trantino has passed his statutory eligibility date. *See also N.J.A.C.* 10A:71–3.18(b) (requiring DOC approval of pre-release halfway house placement).

1. Letters of threat, received by my office, warning that Mr. Trantino would be killed if paroled. The three (3) letters were unsigned and very crudely written. One letter was alphabetized, meaning constructed by letters cut out from magazines and newspapers to spell out the threat. The letters did not have a place of origin identifying the area where mailed. Letters were received on or about mid-January, and were shared with the Classification Committee in order to render an informed decision.

2. The committee also took into consideration the circumstances of the offense and the risk if possible adverse community reaction if inmate Trantino was permitted to participate in a residential community release program.

In considering all of the above factors, a unanimous decision was rendered by the Institutional Classification Committee, in keeping with the provisions of New Jersey Administrative Code 10A:20-4.12 which provides for Institutional Classification Committee review and disposition.

Further be advised, notwithstanding the letters of threat, inmate Trantino would have been denied based on other factors referenced under the above cited provision. As his case has high visibility and notoriety, through the news media and through Senator Kosco who vehemently objected to the parole and community release of inmate Trantino.

In concluding this report, the letters of threat have been misplaced, as it is my recollection that they were to be processed to Internal Affairs; however, this is a standard procedure, and it is possible that they were misdirected. For your further review and assistance, I have Mr. Trantino's application, classification blocks and reports to Senator Kosco all addressing the situation of inmate Trantino's parole.

On September 1, 1994, Trantino's parole was again denied and he received another thirty-six month FET. At that hearing Mr. Jones was replaced by Mr. Rolando Gomez Rivera. The hearing concentrated on Trantino's background and the events surrounding the crime. Consovoy was again critical of the DOC, stating "most people would agree that the Department of Corrections has just made a mess of this thing because they've never decided how to treat you," that the decisions not to accord halfway house status was inconsistent with the two furloughs and sixty-nine trips into the community that had been granted, but that the Board had voted that it was not going to parole Trantino to a halfway house because the DOC had an obligation to place him there as an inmate. At the hearing Trantino accepted responsibility for the crimes, and stated intimate details of the events before and after the shootings, but denied recollection relating to the shootings themselves.

On March 13, 1995, not having received a written decision from the September 1, 1994 hearing, as required by *N.J.S.A.* 30:4–123.55(d) and *N.J.A.C.* 10A:71–3.18(e), Trantino filed administrative appeals to the full Parole Board from the November 12, 1993 and September 1, 1994 denials. *See N.J.A.C.* 10A:71–4.2. In the absence of a response, Trantino filed a petition for a writ of *habeas corpus* in the Law Division. The court denied the application because of lack of jurisdiction.

On April 17, 1995, the two-member panel rendered reasons for its decision following the September 1, 1994 hearing. The opinion concluded that:

After due consideration and deliberation, the Adult Panel has concluded that Mr. Trantino has not reached his full rehabilitative potential, therefore the punitive aspect of his sentence has not been satisfied, and that a substantial likelihood that he will commit a crime if released on parole at this time continues to exist, and parole is denied. This panel has established a Future Eligibility Term of thirty-six (36) months, within the established guidelines for the crime of murder.

. . . .

During this panel hearing Mr. Trantino was once again in doubt as to whether he in fact murdered the police officers, stating "I am not capable of killing those two men. I could not have done that." This is of great concern to this panel. Until and unless Mr. Trantino can completely, honestly, openly and consistently confront and fully admit his role in these murders, he can not be said to be completely and totally rehabilitated as per the Court's holding in the original Trantino decision.

. . . .

The Adult Panel acknowledges Mr. Trantino's charge free institutional adjustment, program participation and full minimum custody in mitigation.

The parties now agree that the opinion misquotes Trantino and mischaracterizes what he said at the September 1, 1994 hearing. Trantino appears to have said that he is not now capable of committing murder and does not remember having been so in the past; but if he did state previously that he could not have done the things for which he was sentenced, he was merely "being defensive." In any event, on April 26, 1995 the full Board considered and denied, without comments, the administrative appeals from the November 12, 1993 and September 1, 1994 panel determina-

tions. Trantino thereupon appealed to us, challenging the various decisions along the way.

On May 8, 1995, Trantino, in a letter to the Chairman of the Parole Board, requested an appeal of the Panel's April 17, 1995 decision noting that the Board erroneously relied on the nonexistent quote from the September 1, 1994 hearing. He proffered additional evidence that he acknowledged that he killed the two police officers and that he was deeply ashamed and suffers for what he did. By letter dated September 6, 1995, the Parole Board advised Trantino that the two-member adult panel, at a meeting on August 30, 1995, determined to vacate its September 1, 1994 decision and relist the case for a *de novo* panel hearing on September 14, 1995. Because Trantino was already scheduled for a new parole hearing in October, having become parole eligible again in the interim, the two hearings were combined. The September 6, 1995 letter from the Chair of the Parole Board also stated that the full Board did not consider the issues raised in Trantino's May 8 letter but that it had reevaluated the action it took on April 26, 1995, and stated that:

In view of the excessive time period that elapsed prior to your submission of the administrative appeal of the November 12, 1993 decision, the State Parole Board determined that it should not have considered your appeal at its meeting on April 26, 1995. Accordingly, the State Parole Board on August 30, 1995 vacated its decision of April 26, 1995.

Because of the scheduling of a hearing for September 1995, the appeals pending before us were dismissed, without prejudice, while Trantino exhausted his administrative remedies. In our order of August 16, 1995, we provided that Trantino could raise all issues respecting all adverse actions by the Parole Board commencing with the December 1993 decision (resulting from the November 12, 1993 hearing) in the event that he remained aggrieved by the Parole Board's action after the September 1995 rehearing.

A two-member adult panel conducted a plenary hearing on September 14, 1995. It essentially covered the subjects discussed at the hearing in September 1994, Trantino's childhood, his family

background, his criminal history and associations, the robbery in Brooklyn before the shootings in question, Trantino's flight, his trial and programs in prison, his television interviews, his writings, and his parole plan.

The panel denied parole, and Trantino was informed that the panel intended to "exceed the guidelines," and establish a future eligibility term greater than thirty-six months, and so would be bringing in a third member as required by the regulations. *See* *N.J.A.C.* 10A:71–3.21(a)(1),(c),(d).

The written notice of decision regarding the September 14, 1995 hearing, dated September 25, 1995, acknowledged that Trantino had made great strides towards achieving his rehabilitative potential over the course of the preceding thirty-two years, but found that his rehabilitative potential had not been reached due to his failure to remember certain aspects of the crime. The decision stated:

It is the Panel's belief that your failure to remember certain details regarding the murder is inhibiting you from reaching your rehabilitative potential. In sum, the Adult Panel is of the position that until you can remember specific events regarding the murder, including firing the gun that killed Sgt. Voto, you will not be able to fully accept your role in the crime and will not achieve your rehabilitative potential. Therefore, the Panel believes there is a substantial likelihood you will commit a crime if released on parole. The Adult Panel is of the belief that based on the severity of the crime for which you were sentenced, your prior criminal record, and your need for long term counseling, a future eligibility date established pursuant to *N.J.A.C.* 10A:71–3.21(a) is clearly inappropriate. Therefore, the Adult Panel is referring your case to a three member panel for establishment of a future eligibility date beyond code guidelines, pursuant to *N.J.A.C.* 10A:71–3.21(d). It is the Adult Panel's belief that a future eligibility term pursuant to *N.J.A.C.* 10A:71–3.21(d) will allow you the opportunity to undergo long-term psychological counseling. Hopefully, this counseling will aid you in your attempt to remember specific details regarding the shooting of Sgt. Voto and other events that took place immediately before and after the murders.

The opinion further notes that, according to the Supreme Court decision in *Trantino Parole Application, supra,* the Parole Board's obligation to scrutinize the adequacy of appellant's punishment in relation to his progress toward rehabilitation is a "continuing" one. Referring to the 1993 proceedings, the panel stated:

The Adult Panel is aware that a different Board Panel determined at your parole hearing on November 12, 1993 that you had reached your rehabilitative potential within the confines of prison and that your progress toward real and not superficial rehabilitation could only be maintained by placement in a halfway house as an inmate. You have attempted on numerous occasions to be placed in a halfway house as an inmate. The Department of Corrections has continually denied you placement into a halfway house. While this Adult Panel believes placement of you into a halfway house would be beneficial to you in your goal to reach your rehabilitative potential, it is this Panel's determination that certainly this is not the only means by which you can achieve this goal. It is this Panel's position that you can eventually reach this goal through long term psychological counseling in an institutional setting.

Finally, because the panel concluded that Trantino had "not reached [his] rehabilitative potential [and] the punitive aspect of [his] sentence has not been satisfied," it found a substantial likelihood that Trantino would "commit a crime if released on parole." Because "long term psychotherapy" was required, the matter was referred to a three-member panel to fix a FET outside the guidelines. *N.J.A.C.* 10A:71–3.21(a), (c), (d). The three-member panel conducted another hearing in December 1995, at which the third member interviewed Trantino essentially about the same subjects previously reviewed with the other two. However, the three-member panel failed to unanimously agree on the future parole eligibility date in excess of the guidelines and referred the matter to the full Parole Board pursuant to *N.J.A.C.* 10A:71–3.21(d).

On April 3, 1996, the full Board voted to impose a ten year FET. On May 20, 1996, the full Parole Board issued a written "notice of decision" formally denying parole and establishing the ten year term. In the interim, we reinstated the appeals.

## V.

■ We agree with the Law Division that it did not have jurisdiction to hear this case under the New Jersey *habeas corpus* statute, *N.J.S.A.* 2A:67–1 *et seq.*

■ The exclusive method for review of action or inaction of a State administrative agency, like the Parole Board, is by direct

appeal to us, pursuant to *R.* 2:2–3(a)(2). *Johnson v. State Parole Bd.,* 131 *N.J.Super.* 513, 517–20, 330 *A.*2d 616 (App.Div.1974), *certif. denied,* 67 *N.J.* 94, 335 *A.*2d 47 (1975). The Supreme Court has exclusive rule making power to implement the constitutional requirement for "review, hearing and relief" in the Superior Court by action in lieu of prerogative writs, *N.J. Const.,* art. VI, § V, ¶ 4, and *R.* 2:2–3(a)(2) embodies the means for reviewing inaction as well as action of a State administrative agency, *Johnson, supra,* 131 *N.J.Super.* at 517–18, 330 *A.*2d 616.

The writ of *habeas corpus* preserved by our Constitution, *Art.* I, *par.* 14, is a "common law ... prerogative writ." *Johnson, supra,* 131 *N.J.Super.* at 519, 330 *A.*2d 616. But when *habeas corpus* is sought because of illegal detention by the DOC or the Parole Board, the applicant must appeal from the agency's action or conduct in holding the prisoner. When we cannot decide how to exercise our prerogative writ jurisdiction in the absence of a record detailing the reasons for administrative action or inaction, we can remand to the agency for a statement of reasons, for further action by the agency, or can permit the Law Division to create a record and make fact-finding, at least when the matter is not cognizable, pursuant to legislation, before an Administrative Law Judge. *Cf. Township of Montclair v. Hughey,* 222 *N.J.Super.* 441, 537 *A.*2d 692 (App.Div.1987) (finding "the exercise of trial court functions such as the gathering of evidence, finding of facts and the application of legal conclusions" necessary). *R.* 4:69–1, dealing with actions "In Lieu of Prerogative Writs," expressly provides that the Law Division has *habeas corpus* jurisdiction only where relief is "not available under *R.* 2:2–3."

## VI.

We briefly restate our scope of review of a Parole Board decision. Although speaking in the context of a Title 2C sentence, we set forth our limited role in *N.J. State Parole Bd. v. Cestari,* 224 *N.J.Super.* 534, 547, 540 *A.*2d 1334 (App.Div.), *certif. denied,* 111 *N.J.* 649, 546 *A.*2d 558 (1988):

A denial of parole is subject to judicial review for arbitrariness. *In re Hawley,* 98 *N.J.* 108, 112–113 [484 *A.*2d 684] (1984). The question whether there is a substantial likelihood an inmate will commit another crime if released, although predictive of future conduct rather than a finding as to past conduct, is essentially factual in nature. Therefore, a reviewing court must determine whether this factual finding could reasonably have been reached on sufficient credible evidence in the whole record. *Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 92–93 [312 *A.*2d 497] (1973). Under this standard, the agency's decision will be set aside "if there exists in the reviewing mind a definite conviction that the determination below went so far wide of the mark that a mistake must have been made." *613 Corp. v. State of N.J., Div. of State Lottery,* 210 *N.J.Super.* 485, 495 [510 *A.*2d 103] (App.Div.1986). "This sense of 'wrongness' arises in several ways, among which are the lack of inherently credible supporting evidence, the obvious overlooking or underevaluation of crucial evidence or a clearly unjust result." *Ibid.* Thus, if the record does not contain sufficient evidence that there is a substantial likelihood an inmate will commit another offense if released, the denial of parole must be found to have been arbitrary and capricious.

[*N.J. State Parole Bd. v. Cestari, supra,* 224 *N.J.Super.* at 547–48, 540 *A.*2d 1334.]

Even though the discretion of the Parole Board is broader with respect to a Title 2A sentence, the scope of review of that discretion is the same. The issues before us on review from both the Parole Board and DOC remain the same.

We reject the contention that a more restrictive standard of judicial review should apply to parole release [or denial] than to other administrative agency decisions. Decisions of administrative agencies are generally subject to a uniform standard of review; such a decision will be upheld unless "it is arbitrary, capricious or unreasonable or is not supported by substantial credible evidence in the record as a whole." *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–580 [410 *A.*2d 686] (1980). Consistent with this generally accepted standard, the Supreme Court said in *Hawley* that: "We find no reason to exempt the Parole Board from the well-established principle that a court may review the actions of an administrative agency to determine if its power is being exercised arbitrarily or capriciously." [*In re Parole Application of Hawley,*] 98 *N.J.* 108, 112 [484 *A.*2d 684]. We add that application of a more restrictive standard of review to decisions of the Parole Board would be inconsistent with the Parole Act of 1979's objective to reduce the discretionary authority of the Board. *See In re Trantino Parole Application, supra,* 89 *N.J.* at 355–356 [446 *A.*2d 104].

[*N.J. State Parole Bd. v. Cestari, supra,* 224 *N.J.Super.* at 548, n. 6, 540 *A.*2d 1334.]

## VII.

The Attorney General takes the position that the administrative appeal of the panel decision issued December 17, 1993, denying

parole in the absence of halfway house placement, was time barred by the 180–day rule, *N.J.A.C.* 10A:71–4.3(a), and therefore is not properly before this court on appeal. He also contends that the appeal from the ICC's decision of February 2, 1994 was untimely, *see R.* 2:4–1(b); *R.* 2:4–4(a), and that, in any event, the pre–1995 proceedings are moot in light of the Board's subsequent hearings and determinations.

The Attorney General candidly acknowledges that no time limit for administrative appeals to the full Board existed before 1995.[6] Moreover, in 1993 and 1994 Trantino was seeking to implement the recommendation for halfway house placement and challenging the denial of parole in its absence. Further, the 1995 panel decision affirmed by the full Board in 1996 concluded that long-term psychotherapy was needed because the DOC "continually denied" placement in a halfway house and that such placement "is not the only means by which [Trantino] can achieve [rehabilitative potential]." Hence, the issues relating to halfway house placement are still relevant, and we need not explore at length whether the ICC's determination constituted final administrative action, whether Trantino exhausted administrative remedies if it did not, and in any event whether he received timely notice or adequate reasons to trigger any applicable time period for appeal. *See* *N.J.A.C.* 10A:20–4.10(d), 10A:20–4.12(f). The 1994 denial of halfway house placement clearly impacts on the 1995 and 1996 decisions regarding parole, and the Parole Board decisions also impacted on the subsequent eligibility for halfway house placement. *See N.J.A.C.* 10A:20–4.7(a).

█ The DOC's decision not to transfer Trantino to a halfway house was never embodied in any final determination of the agency. *Cf. Jenkins v. Fauver,* 108 *N.J.* 239, 528 *A.2d* 563 (1987) (upholding DOC transfer of inmates from full minimum status to

---

[6] In 1995, however, the Department of Corrections adopted *N.J.A.C.* 10A:71–4.3, effective February 21, 1995, requiring administrative appeals from the adult panel to be made within 180 days of the decision.

full minimum-inside only); *see also White v. Fauver,* 219 *N.J.Super.* 170, 530 *A.*2d 37 (App.Div.1987). Certainly the words "seen for community release" were not reasons, as the Board panel subsequently told Trantino. Nor can the letter from Riverfront Administrator Lewis to a DOC investigator suffice as the final administrative action or substitute for the necessary statement of the reasons for the decision. *See N.J.A.C.* 10A:20–4.10(d). The Commissioner is responsible for the final agency determination, and we cannot find in the record any reasons rendered by him or his office for the decision not to transfer Trantino.

However, *N.J.A.C.* 10A:20–4.12 places authority for such transfer decisions in the ICC. Thus, even if its determination is final on such matters, *see N.J. State Parole Bd. v. Cestari, supra,* 224 *N.J.Super.* at 542, n. 2, 540 *A.*2d 1334, the decision (embodied in a memorandum filed in June 1995, almost one and one-half years after it was rendered) was based on letters not produced in the record and which we are told were "misplaced." The decision was also premised on the fact that Trantino's case had "high visibility and notoriety, through the news media and through Senator Kosco who vehemently objected to the parole and community release of inmate Trantino." These reasons embodied in an internal DOC memo, without a supporting record (or reconstruction) simply cannot be the basis for denying transfer when the Parole Board considered such placement critical to the parole process. *See N.J.A.C.* 10A:20–4.10(d), –4.12(f).

Our Supreme Court has already stated "that public outrage over an imminent parole determination, such as that which has occurred in this case, has no place in a parole proceeding and is to be given no weight in a parole decision." *Trantino Parole Application, supra,* 89 *N.J.* at 376, 446 *A.*2d 104. We do not necessarily read the decision as applying to the ancillary DOC decision making incident to the pre-parole process.[7] And it cannot matter

---

[7] *N.J.A.C.* 10A:20–4.12(c) requires the ICC "to reject an inmate's application when placement in a Residential Community Release Agreement Program would

if the public outrage is voiced directly or through a State Senator. However, as Parole Board member Consovoy made clear, the "adverse community reaction" has to relate to the area where the placement will occur. *N.J.A.C.* 10A:20–4.12(c).

That is not to say that threats to an inmate, or to others with whom he would be in close proximity outside the security of prison, is not a legitimate basis for DOC decision making. But such a decision so critical to the parole process cannot turn on an internal memorandum supported by no record when the documents themselves cannot be reviewed by DOC superiors or the courts of competent jurisdiction.

Accordingly, we remand to the DOC for consideration of an updated application for halfway house (or out-of-State transfer) and for findings and a statement of reasons with regard to such application. If the decision is premised, in whole or part, on concerns for the safety of Trantino or others, it must state reasons for the DOC's conclusions that the threats are real and why the safety of Trantino and others cannot be reasonably protected with available resources. The public may be reasonably outraged by Trantino's lawless conduct, but it cannot be presumed that those so outraged will resort to the type of conduct they find so offensive.

■ We recognize that halfway house placement does not involve a liberty interest giving rise to due process rights. *Jenkins v. Fauver, supra; Dominique v. Weld,* 73 *F.*3d 1156 (1st Cir.1996); *O'Neal v. New Jersey State Parole Bd.,* 149 *N.J.Super.* 174, 181, 373 *A.*2d 657 (App.Div.), *appeal dismissed,* 75 *N.J.* 590, 384 *A.*2d 821 (1977); *see also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 *U.S.* 1, 99 *S.Ct.* 2100, 60 *L.Ed.*2d 668 (1979); *Connecticut Bd. of Pardons v. Dumschat,* 452 *U.S.* 458, 101 *S.Ct.* 2460, 69 *L.Ed.*2d 158 (1981); *New Jersey State Parole Bd. v. Byrne,* 93 *N.J.* 192, 206–07, 460 *A.*2d 103 (1983) (regarding

pose a threat to the community or cause adverse community reaction." No attack is made on the regulation and we neither pass on it nor conclude it is unreasonable.

parole). But our regulations require a statement of reasons for the denial of halfway house placement, *N.J.A.C.* 10A:20–4.10(d), and given the relation between this subject and the Parole Board's action for approximately six years, we conclude that reasons for the DOC action or inaction on the subject are required. *Cf. Beckworth v. New Jersey State Parole Bd.*, 62 *N.J.* 348, 301 *A.*2d 727 (1973); *Monks v. New Jersey State Parole Bd.*, 58 *N.J.* 238, 277 *A.*2d 193 (1971) (holding that statement of reasons given to inmate met judicial requirements); *see also N.J.A.C.* 10A:71–3.18(b) (effective February 21, 1995).

Finally, we reject our dissenting colleague's conclusion that we should order the Parole Board to parole Trantino to a halfway house or residential facility inside or outside of New Jersey if the DOC does not perfect a pre-release placement "on a timely basis." (Opinion at 489, 687 *A.*2d at 303). As we have already noted, in footnote five, *supra, N.J.S.A.* 30:4–123.59(d) authorizes the Board to grant parole conditioned upon placement in a residential facility or halfway house. But Trantino does not argue, and we find no authority to support a claim, that the DOC approval for such placement is unnecessary. *See N.J.A.C.* 10A:20–4.1 *et seq.;* 10A:71–3.18(b). In any event, the record details the consistent position of the Board that it cannot prudently grant parole to a long term prisoner, convicted of a crime such as murder, before performance in a halfway house or residential facility can be thoroughly evaluated. And we cannot say that this policy is arbitrary or unreasonable. While the failure to successfully satisfy a condition of parole would require formal violation of parole proceedings before returning the parolee to custody, the same conduct before parole would not, and evaluation of an inmate's conduct in such a setting is, in any event, valuable in assessing whether or not the inmate is ready for parole and the conditions to be attached.

## VIII.

The Parole Board cannot ignore the prior history of the case by looking at the 1995 and 1996 proceedings in isolation. However,

the Board concluded that long-term psychological therapy is required in the institutional setting, particularly because halfway house placement and evaluation are unavailable, and a ten year FET was set "in order to provide you with the opportunity to participate in appropriate psychological counseling to address your lack of responsibility and insight."

Before us the Board appears to take the position that new evidence must support a basis for a denial of parole and future FET following expiration of a prior FET. *See N.J.S.A.* 30:4–123.53; 30:4–123.56; *see also N.J. State Parole Bd. v. Cestari, supra,* dealing with a Title 2C sentence. *N.J.S.A.* 30:4–123.56(c) provides that "[a]n inmate shall be released on parole on the new parole eligibility date unless new information filed pursuant to a procedure identical to that set forth in [*N.J.S.A.* 30:4–123.54] indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time." However, given the different standards for parole for Title 2C sentences, which are subject to presumptive parole, and Title 2A sentences as construed in *Trantino Parole Application, supra,* we do not believe *N.J.S.A.* 30:4–123.56(c) is dispositive with respect to a 2A sentence. *See also Byrne, supra.*

█ In any event, to support its conclusion that new evidence justifies its decision, the Board points to a paragraph in a psychological report prepared by Bell in July 1995 that Trantino "believes that his co-defendant shot the victims but cannot recall specific aspects of the event, because he was in an alcohol/speed blackout." The Board also noted that in its interview with Bell, the psychology consultant noted "that there were a lot of fluctuation in definition of several events, several aspects of this event including taking responsibility for the shooting. . . ." Fergusson, who conducted a psychological evaluation on August 8, 1995, noted that:

Thomas also described vivid visual hallucinations on the night of the present offense which have previously been called into question, as to their authenticity,

particularly in light of his inability to recall the offense itself. While it is unquestionable that hallucinations can be fabricated, given the extent of his alcohol and amphetamine consumption at the time, it is also quite conceivable that Thomas was experiencing a drug induced psychotic state when he committed the offense. The existence of a psychotic break could also explain how Thomas could commit a crime, so contrary to his moral character. The incongruence between his moral values and the brutality of his actions during the offense may also explain the level of repression that Thomas reports for the actual offense itself, while retaining clear memories of events both prior to and following the actual offense.

As Chief Justice Weintraub pointed out in 1965, Trantino testified that he could not recall the events of the crime due to his intoxication and mental condition. As we have demonstrated, Trantino maintained the same position throughout. In the transcripts of the hearings of April 1, 1993, November 12, 1993, September 1, 1994, September 14, 1995, and December 11, 1995 presented to us on this appeal, Trantino repeatedly talks about and is questioned by Board members regarding what he can and cannot remember. The fact that Trantino said he takes "responsibility" for his conduct, but does not recall the specifics of the shootings—or states that he may have left the site by the time one or both shootings actually occurred—does not by itself constitute a "new factor." [8] But what is "new" is the Board's finding, following recent interviews with Trantino, regarding the significance of the facts Trantino recalls and those he says he cannot recall—a position evidencing lack of candor or credibility impacting on the "likelihood of future criminal activity if he is released." *See Trantino Parole Application, supra,* 89 *N.J.* at 377, 446 *A.2d* 104.

This is not the occasion for us to consider the legal consequences which can flow in the parole context from a defendant's insistence that a plea of not guilty was properly entered or that he

---

[8] For example, at the September 14, 1995 hearing Trantino stated he had

no conscious memory of shooting [Voto], that [s]ome things are black, some things I could remember.... Some things I have absolutely no memory of.... I say I have no conscious memory of it. I have said I have committed this murder. I am responsible for both murders, and it's hearsay— ... [b]ecause the prosecutor said I did it ... the police said I did it. It's very hard for me to accept it because it is such a painful thing. I don't remember it, but I did, and I'm responsible for both of the deaths...

was wrongly convicted. *See Paz v. Warden, Fed. Correctional Inst.*, 787 *F.*2d 469 (10th Cir.1986). Nor is it a case where the inmate asserts no recollection at all due to repression or in which he offers expert proofs why he can remember certain significant details while having no recollection of others.

This is a case in which the Parole Board found that Trantino provided certain details in recent interviews and hearings that are inconsistent with his assumption of responsibility for the deaths of Voto and Tedesco and particularly the shooting of Voto. Much of the discussion at the parole hearings and in the Parole Board's interview of Bell seems to stem from differing understandings of the meaning of the word "responsibility." Trantino appears to acknowledge "responsibility" based on what he recalls and what he has learned, while denying recollection of certain details and disagreeing with trial witnesses about others. However, the Board has also found that, at least with respect to some of the details Trantino has given its hearing officers and professional interviewers, that his lack of recollection about some things and his specific recollection about others are not always consistent.

That view gains some support from a review of Chief Justice Weintraub's description of Trantino's trial testimony, *supra*, and his testimony before the panels. Moreover, what Trantino seems to remember at the 1994 and 1995 hearings, for example, that he dropped his gun after he hit Voto with it, that Falco ordered Voto to strip, and regarding where he may have been at the time of the shooting can be said to be inconsistent with his true acknowledgement of responsibility. But even if we were to disagree with the Board in this respect, the judgment is not ours to make. We must defer to the Board's interpretation and analysis because the Board, not this court, is charged with the responsibility of evaluating credibility in the context of the potential for recidivism.

Mr. Bell diagnosed Trantino as having an "anti-social character" and Fergusson noted an "antisocial personality disorder." Both stated that he functioned well in the institutional setting, but expressed some concern about direct release on parole from his

lengthy incarceration without adequate support and preparation. Fergusson recommended ISP supervision and noted that "the halfway house system [would be] another addition to the support system" and "a testing ground also." He noted that "[a]ny weakening in the support network or evidence of relapse into substance abuse could lead to disastrous results." Particularly in light of the Parole Board's inability to observe Trantino in a halfway house program, the denial of parole and ten year FET cannot be said to constitute an abuse of discretion. *See Trantino Parole Application, supra,* where the Parole Board was required to review the question of parole *de novo* in light of frustration of the restitution condition. *See also Thompson v. New Jersey State Parole Bd.,* 210 *N.J.Super.* 107, 111–15, 509 *A.*2d 241 (App.Div. 1986) (denial of parole with twenty-two month FET in 1982 and twelve year FET in 1984 for Title 2A offender convicted of murder sustained over *ex post facto* claim and other challenges).

In *Royster v. Fauver, supra,* the Third Circuit rejected a challenge on *ex post facto* grounds to a nine year FET imposed in 1983 upon an inmate convicted of murder under Title 2A. 775 *F.*2d at 531–32. The Parole Board "noted that Royster had continually denied his guilt despite overwhelming evidence against him . . . and it suggested that this had been a factor in denying Royster his parole." 775 *F.*2d at 534. According to the court:

> Because an inmate's contrition and the gravity of his crime are relevant to the determination of whether the punitive aspects of his term have been served, the Board's consideration of these factors was appropriate. *Ibid.*

Our courts have not passed upon the application in a Title 2A case of the FET guidelines involving presumptive parole for Title 2C offenses. It is arguable they should not apply because of the discretion accorded to the Board in Title 2A cases under *Trantino Parole Application, supra.* But even if they apply, the extended FET established in this case cannot be said to be arbitrary or capricious.

The Attorney General has estimated that, with credits, the ten year FET will result in Trantino's eligibility for parole in "October 2000, approximately 5 years after his parole denial." Moreover, in

its 1996 opinion the Board pointed out that the ten year FET does not mean the matter will not be regularly reviewed. As the full Board stated in its 1996 notice of decision to Trantino:

Pursuant to *N.J.A.C.* 10:71–3.21(f) you are entitled to annual review hearings. At an annual review hearing, a Board panel will be able to assess your progress in various programs, including counseling, which may indicate that the punitive aspects of our sentence have been satisfied. At the conclusion of an annual review hearing, the Board panel shall have a number of options available including, but not limited to, determining whether you should be referred for a parole release hearing.

At the annual review, Trantino's progress, the impact of any change in placement, or his endeavors to show why his statements in counselling are not inconsistent with his acknowledgment of responsibility may be presented to the panel.

## IX.

We are satisfied that the other arguments raised before us do not warrant discussion. *R.* 2:11–3(e)(1)(E).

## X.

Trantino is serving a sentence of life imprisonment, and is doing so because the death penalty has been invalidated. He has no right to parole, *Greenholtz v. Nebraska, supra; see also Connecticut Bd. of Pardons v. Dumschat, supra; Byrne, supra,* 93 *N.J.* at 208, 460 *A.*2d 103, and Trantino can be compelled to serve his sentence for the rest of his life. The granting of parole is within the discretion of the Board, and we must give great deference to the expertise of the Board in its parole decisions and not upset them unless it clearly and convincingly appears that the Board has abused its discretion. *State v. Lavelle,* 54 *N.J.* 315, 255 *A.*2d 223 (1969); *New Jersey State Parole Bd. v. Cestari, supra; O'Neal v. New Jersey State Parole Bd., supra,* 149 *N.J.Super.* at 182, 373 *A.*2d 657. Given the record before us, we cannot conclude that the Board has acted arbitrarily in trying to fashion a parole plan.

The final administrative action of the Parole Board denying parole and establishing a ten year FET is affirmed. The matter is

remanded to the DOC for further proceedings as provided herein. We do not retain jurisdiction.

PRESSLER, P.J.A.D., concurring in part, dissenting in part.

I concur in the remand to the Department of Corrections, but I would direct it forthwith to place defendant Thomas Trantino in a pre-parole halfway house or residential facility or to effect his out-of-state placement. In the absence of such prompt action by the Department, I would remand to the Parole Board for its prompt consideration of parole-release conditions including, if a pre-release halfway house placement is not possible, then a closely monitored post-release placement as well as such other parole conditions as the Board concludes are necessary and appropriate. I would so do because I am persuaded that the record overwhelmingly demonstrates the arbitrariness and unreasonableness of both the Department's denial of halfway house or out-of-state placement and the Parole Board's decision, responsive to that denial, to deny parole and impose a ten-year future eligibility term.

I reach these conclusions well aware of the narrow scope of appellate review and the broad latitude necessarily accorded to the Parole Board in the exercise of its statutory function. Moreover, in reaching these conclusions, I do not intend to minimize in any way the heinousness of defendant's unspeakable 1963 crime, or to depreciate the irremediable agony of the families of the victims, or to deprecate the still palpable trauma that rocked their hometown communities.[1] Nor do I have any doubt of the legitimacy of the cry for vengeance and retribution raised by those who suffered a heart-rending loss in a heart-rending way. Were I one of them, I would, I am sure, join that cry. But my obligation is different. My commitment must be to the substantive due process of law and

---

[1] On October 3, 1996, a story appeared on the first page of the *New York Times* Metro Section, under the headline "Locked Up in a Town's Memory." The sub-heading was "Two 1963 Slayings Still Rouse Passion in Lodi, N.J." The three-column picture above the story shows the demonstration in front of the courthouse on the day this appeal was argued.

to the integrity of the legal system, which, in the end, is all that ultimately protects us all. I am certain that my colleagues are adhering to that same commitment as they understand its dictates in this case. I understand them differently, and that is why I am constrained to disagree with the result they have reached.

The basis of my disagreement, as difficult as it may have been for me to arrive at, is equally simple to explain. In 1982, the Supreme Court, in *In re Trantino Parole Application*, 89 *N.J.* 347, 446 *A*.2d 104 (1982), remanded to the Parole Board for its reconsideration of defendant's fitness for parole. It specified the two-pronged standard the Parole Board was obliged to apply to its decision—rehabilitation and the unlikelihood of recidivism. It also made clear that the punitive aspects of the sentence could not be considered as an independent factor, but only as a component of rehabilitation. Of signal importance was the Court's recognition that between 1979, when defendant first became parole eligible, and the date of its decision only three years later

[t]he public outcry over Trantino's possible release was loud and swift. The families of the murdered officers organized efforts to keep Trantino in prison, and his case became the focus of widespread media attention, including a television special called "The Night of the Devil." Crowds of demonstrators have followed this case vociferously at every stage. [*Id.* at 353, 446 *A*.2d 104.]

Thus, after explaining in careful detail the relevant interplay between the former parole statute, *N.J.S.A.* 30:4–123.1 to 123.44, and the Parole Act of 1979, *N.J.S.A.* 30:4–123.45 to –123.69, the Court, in prescribing the legal principles by which the Parole Board's reconsideration of defendant's parole was required to be informed, added this caveat:

Furthermore, it is undeniable that public outrage over an imminent parole determination, such as that which has occurred in this case, has no place in a parole proceeding and is to be given no weight in a parole decision. [*Id.* at 376, 446 *A*.2d 104.]

On remand, the Parole Board set a ten-year eligibility term, which, with good time and work credits, brought Trantino up for parole consideration again in 1988. A two-member panel of the Board voted to grant parole. This decision was overruled by a majority of the full Board whose expressed reason for the denial

was the perception that Trantino had not achieved his rehabilitative potential nor satisfied the punitive aspects of his sentence by reason of his refusal to have participated in substance abuse counseling and long-term psychotherapy. The Board set a thirty-six month future eligibility term. This court, in an unpublished opinion under Docket No. A–5379–87 filed on March 30, 1990, affirmed the Board's decision. Although we did not expressly address the significance of Chairman Dietz's 1988 statement, it is clear from our opinion that we were satisfied that Trantino's refusal to undergo drug and alcohol abuse counseling and long-term psychotherapy, as had been urged by the Board in 1982, constituted a significant new adverse factor.

Trantino again became eligible for parole in September 1990. My review of this record convinces me that every adverse administrative decision respecting defendant's incarceration since that time, up to and including the imposition of this latest ten-year future eligibility term, has been primarily responsive to the interdicted public outrage, abetted by political pressure in various forms, and has not been guided by the standards mandated by the Supreme Court. Indeed, the Court's description in 1982 of the forms of public outcry attending this matter is as accurate today, almost fifteen years later, as it was then, and as I view this record, it is that public outcry—rather than a fair evaluation of relevant facts and psychological opinions—that has accounted for the parole denials and placement decisions of the last five years and for this most recent imposition of a ten-year future eligibility term which I believe to be indefensible on this record.

There is not much more that needs to be added to the detailed factual and procedural statement of the majority to demonstrate my point. Defendant has been a model prisoner at least since 1976, when he earned full-minimum status. In 1978, he was assigned to work as a counselor with young inmates at an honor camp in the Wharton Tract. While assigned there, he participated in work details in the community, accompanying juveniles on at least sixty-nine recreational trips outside the prison. He was

granted prison furloughs, and it was on one of the furloughs in 1980 that he married his present wife. Although he lost his minimum status when the ten-year FET was imposed in 1982, it was soon restored after an appeal. Essentially, defendant has been on full-minimum status since 1978, infraction free for over twenty years, and in his now thirty-three years of incarceration has never been involved in any violent act or suggestion of drug or alcohol abuse. On the positive side, he has undergone drug and substance abuse counseling, has been a leader of a group therapy program for juvenile offenders, has completed numerous self-help, peer counseling and psychotherapy programs, and has earned college credits. All of the psychological assessments of the last ten years have been positive as well, particularly the last by Dr. James Bell, which, in an odd turnabout, was relied on by the Parole Board not only in denying parole but also in imposing the ten-year FET.

It is against this background that I consider the administrative decisions appealed from and conclude that their asserted bases are pretextual. This is particularly so in view of the Parole Board's own recognition, both directly and by implication, during the better part of the last decade, that Trantino is parole ready.

A fair recitation of the relevant events must begin with the 1982 parole hearing conducted on remand from the Supreme Court's decision that year. The disposition reached by the Parole Board following that hearing was the denial of parole and the imposition of a ten-year FET (future eligibility term). Chairman Christopher Dietz explained to Trantino at the time that decision was announced to him that upon completion of that FET, the punitive aspect of Trantino's sentence, as an independent parole consideration, would be deemed fulfilled. Chairman Dietz further explained to Trantino that what the Board had actually concluded was that the independent punitive aspect of Trantino's life sentence as a Title 2A prisoner should be equivalent to that of a Title 2C life-sentence prisoner. Since the latter was then statutorily subject to a twenty-five-year parole ineligibility period, Trantino

should be similarly subject and that after that period was served, he would be entitled to a presumption of fulfillment of the punitive aspect and his parole status would be considered only in terms of the same rehabilitation factors as applied to all prisoners eligible for parole. This is what Chairman Dietz said:

CHAIRMAN DIETZ: Okay. The State Prison cases under the Parole Act, when there is a denial of parole the Board has an obligation to set a future eligibility term. What the Board did was set a future eligibility term that would carry with it a presumptive—in other words we've considered the punitive aspect, we've considered the rehabilitative integration into that, and we've come up with the future eligibility term. When that term has been served and your credit pattern earning that you've established and the fine efforts that you've made, you can then say—it's something for you to hope to. In other words we are saying that in approximately five to five and a half years when perhaps the 25 year mandatory minimum might have been served had that been imposed, you have under the current law the right to presume that there will be. Where that presumption was not available to you because this was a precode case. We've tried to move it to that. So that there is some degree of certainty for you. We felt that you shouldn't leave this hearing today without understanding the hope—light at the tunnel, and understand that it will end, and society has that obligation also to understand. But the Board is not just saying we are denying now and maybe next time we are going to deny and maybe the next time we are going to deny. What we are saying is we dealt with the issue once and for all, of the punitive aspect of the sentence. That issue for us is resolved, unless of course through aborant [sic] behavior you were to do something that gave rise to its reconsideration. But if it weren't, and all those aspects have been done, we are now looking at a day when you will be released.

MR. TRANTINO: Yes, but that's what I don't quite understand. What is—I don't know how that is being—

CHAIRMAN DIETZ: It's a ten year eligibility term to be computed from that day.

MR. TRANTINO: From this date?

CHAIRMAN DIETZ: From this date, less commutation credit, less work credits, less min credits, so that when that period of time expires the provisions of the current law, not as we considered it today under the remand from the Court, you can then feel that your efforts would have produced. Because it's important for you to have some degree. I think the Board felt very strong in trying to arrive at a certainty. Because we feel strongly that there should be certainty and hope for any individual who is incarcerated, so he can look to the day that he will be released at—provided his behavior is good and all the things are good and he has earned that privilege. And that's what the Board has tried to do. It was a very, very difficult decision to do, but it—we have resolved that for ourselves at this time.

As I discuss hereafter, I am satisfied that Chairman Dietz's reading of *In re Trantino, supra,* in respect of the critical

distinction between 2A and 2C prisoners, namely the determination of when the presumption of parole release arises, was eminently correct. I am also satisfied that Trantino was correctly assured that upon his completion of the ten-year future eligibility period,[2] he would be entitled to parole release unless, as Chairman Dietz put it, "through aberrant behavior you were to do something that gave rise to its reconsideration."

That brings us to 1988, when the ten-year FET was completed and, indeed, as the Parole Board had intended, just twenty-five years after Trantino was first incarcerated. As noted, despite the affirmative recommendation of the two-member panel, the Board's majority voted to deny parole, and this court upheld that decision based on Trantino's having refused to follow the Board's 1982 recommendation with respect to substance abuse counseling and psychiatric therapy. Insofar as I am able to determine, that was the last time prior to these appeals that this court considered Trantino's status.

Since the 1988 denial Trantino has been participating in every available institutional program, including both individual and group psychotherapy, Alcoholics Anonymous, and a variety of substance abuse counseling programs. He also completed programs offered by Rutgers University to qualify as a substance abuse counselor with emphasis on juvenile counseling and has been so occupied. He has also earned over thirty college credits. He has been psychologically evaluated repeatedly over the last five years with respect to his suitability both for halfway house placement and parole release. The reports thereof, even the least enthusiastic, have been unanimous in concluding, at least since 1991, that Trantino is a suitable candidate for parole and is not, in agency litany, a risk for "escape, assault or suicide." The reports all recommend parole subject to close initial monitoring, prefera-

---

[2] That ten-year eligibility period was anticipated by the Parole Board to be served, with credits, in five to six years, resulting in a total incarceration at that time of twenty-five years.

bly preceded by halfway house placement or, at least, subject to intensive preliminary supervision.

This is the relevant post–1988 history as appears in this record. In November 1990, Trantino came up for parole again. A two-member panel voted to deny, a three-member panel thereafter convened was unable to agree, and that matter came before the full Board, which in November 1990 affirmed the denial and imposed a forty-eight month FET. Although the record does not indicate precisely how the matter then came before it, the full Board voted in May 1991 to vacate its previous decision and to conduct a *de novo* review. A new hearing took place on September 18, 1991, and resulted in the decision to impose another thirty-six month FET "with recommendation that DOC place Mr. Trantino in a halfway house." The Board's formal decision was issued on October 9, 1991. After acknowledging "the positive efforts Mr. Trantino has made during his incarceration, specifically his participation in psychological counseling and substance abuse programs since his last hearing," the Board concluded, based on the "confidential professional reports," that he "can still further benefit from individual and group counseling thus giving him a greater opportunity to achieve his rehabilitative potential." Expressing concern as well with Trantino's "lack of an appropriate parole plan," the Board concluded that "rehabilitation has not yet been sufficiently achieved and therefore the punitive aspect of his sentence has not been satisfied." Accompanying its consequent imposition of a thirty-six month FET, the Board made these recommendations:

Prior to Mr. Trantino' next scheduled hearing, the Full Board urges Mr. Trantino to make every effort to complete the following recommendations. It is suggested that Mr. Trantino continue his participation in supportive programs available within the institution to better prepare himself for his eventual return to the community and thereby reduce the likelihood of his return to criminal activity upon his release. The Full Board urges Mr. Trantino to continue to maximize his participation in psychological counseling and to make every effort to achieve halfway house status in order for the Board to evaluate his behavior in a less structured environment.

The Full Board also recommends that Mr. Trantino maintain his charge-free institutional adjustment record and avoid any institutional charges between now and the time of his next scheduled hearing.

It appears, however, that even before the 1991 formal decision was rendered, release options were being explored by the Department. The record includes the minutes of a September 24, 1991, meeting of the Executive Committee of the New Jersey Association on Correction, convened, at least in part, for the purpose of reviewing "the Department of Corrections' request to NJAC to consider taking Thomas Trantino into Clinton House as a parolee on ISSP." Apparently, at that time there had been discussion about transferring Trantino to Pennsylvania, the minutes noting that "the State of Pennsylvania which would be supervising him under the interstate compact had recommended completion of a halfway house as a pre-condition for parole." The minutes next reflect a frank discussion wherein the participants favorably considered Trantino's suitability for the program despite the counterbalancing factors of notoriety, press interest, and political pressure. Peculiarly, however, the Committee had also at the time of its meeting been advised that, after making its initial request of NJAC, the Department, by its then Commissioner, had "decided not to pay for Trantino's stay." [3] Finally, after receiving information that the psychological opinion was that Trantino "indicated good adjustment and low likelihood of recidivism," the Committee

---

[3] The Commissioner's decision in that regard is not easily understood. The record includes a page of a deposition given by that same Commissioner, although the date and occasion thereof are not specified, in which the Commissioner testified that he had advised the Parole Board Chairman as follows:

I told him that my position was that I felt that Thomas Trantino had met the requirements of anything that the Department had put on him. He had, at that point, good reports from people that dealt with him, housing officers, work detail supervisors, and that in the one sense I didn't—was not interjecting myself into the parole process, which was not my role, but saying I didn't see anything as far as the Department was concerned that he could have done more to demonstrate parole ability.

Q   Do you still hold that view?

A   I think, yeah. I don't think there is a lot more he could do to demonstrate parole ability.

adjourned on the inconclusive note of reference for further NJAC staff consideration.[4]   In any event, Trantino was unable to obtain a halfway house placement prior to his next parole hearing, which took place in June 1992 and resulted in a formal decision on December 1993.

The December 1993 parole decision was preceded by a series of Adult Panel considerations, first a two-member panel, then a three-member panel and then another two-member panel, as well as Trantino's referral for another round of psychological evaluations.   The Board's decision made extensive reference to the Supreme Court's 1982 opinion, and, echoing Commissioner Dietz's 1982 statement, noted that it was no longer within its province to consider the punitive aspect of the sentence "in the sense of societal retribution and deterrence" but could consider it only in terms of the inmate's rehabilitative potential.   Reviewing Trantino's rehabilitative progress at least since the 1988 parole denial, the Board had this to say:

> Mr. Trantino has in his current restricted environment, in our opinion, done his best to address these and other issues identified by the Parole Board, and the most recent professional reports reflect this progress.   This panel, therefore, acknowledges that Mr. Trantino *has* reached his rehabilitative potential within the confines of his current state prison setting.   However, given the specific facts of this particular case the absolute inability to function in society prior to this crime, even as a supervised parolee;  his long and difficult path towards real and not superficial rehabilitation;  with his only recently addressing some major issues;  and the length of his incarceration, (John F. Kennedy was President of the United States when Mr. Trantino was incarcerated), we believe that he cannot be judged to have reached his true and full rehabilitative potential until and unless he has achieved an intensive, therapeutic and rigorously supervised, gradual reintegration into society. In New Jersey, the only present means to achieve this crucial goal is through the placement by the Department of Corrections of Mr. Trantino in a halfway house while still an inmate.

> The Parole Board firmly believes that this last and vital step must be attempted before Mr. Trantino could even be considered to be fully rehabilitated and granted parole.   Although we believe that it is not unreasonable to conclude that Mr. Trantino has made impressive strides in resolving his problems and internal conflicts that led to these homicides we will only have full knowledge of this man's

---

[4] The Committee's minutes further noted NJAC's awareness that "political decisions" regarding Trantino were being made by DOC.

rehabilitation through the reintegration process of a community based halfway house setting. In that context we can evaluate Trantino's readjustment to societal and not institutional stresses, to societal and not institutional. failures, and to societal and not institutional temptations. Only through this process can the Parole Board judge if this man has been truly rehabilitated. The Adult Panel is of the opinion that the placement of Mr. Trantino to a halfway house should be done while he is an inmate to insure the legitimate interests of all parties.

The decision then concluded as follows:

The Adult Panel is of the opinion that if Mr. Trantino can successfully enter and complete a correctional halfway house program as an inmate he can achieve his full rehabilitative potential and therefore will satisfy the punitive aspect of his sentence and meet the substantial likelihood test.

The Adult Panel acknowledges Mr. Trantino's charge free institutional adjustment, program participation and full minimum custody in mitigation. Professional reports classified as confidential did not play a significant role in the Adult Panel's decision.

Prior to Mr. Trantino's next scheduled hearing, the Adult Panel urged Mr. Trantino to make every effort to complete the following recommendations: it is suggested Mr. Trantino continue his participation in supportive programs available within the institution to continue to prepare himself for possible return to the community and thereby reduce the likelihood of return to criminal activity upon his release. The Adult Panel further recommends that Mr. Trantino make every effort to achieve halfway house status in order for the Board to evaluate his behavior in a less structured, transitional environment.

The immediately ensuing events are, in my view, most telling. It appears that at about the time of this decision, the Department was in the process of making arrangements to transfer Trantino to an out-of-state prison system for its independent evaluation and consequent placement of Trantino in a halfway house. News of those pending arrangements was obtained by the press, which disclosed that prospect in the last days of December. On January 4, 1994, a highly placed state senator, chairman of an important senate committee, wrote to the superintendent of the prison in which Trantino was confined. His letter referred to the recent press coverage, expressed his outrage that plans were being made that might lead to Trantino's ultimate release, and announced that in view of the stories in the press, he had scheduled a hearing by his committee in three weeks' time to study the parole process and desired the superintendent's attendance at the hearing to discuss "the parole process in general, and more specifically, the process

as it relates to Mr. Trantino." Similar written expressions of outrage were communicated to Department of Corrections personnel by at least one other elected representative and several highly placed law enforcement officials. By January 7, 1994, the press reported that the out-of-state arrangement had been dropped, and the senate committee chairman, on January 14, 1994, wrote to the Executive Director of the Parole Board to express his satisfaction and to advise of the cancellation of the scheduled committee hearing.

In the meantime, Trantino had been for some time pursuing, by formal application to the Department, pre-release community placement either with Volunteers of America or Clinton House, both of which were apparently prepared to accept him. That application had, apparently, been verbally rejected at the end of 1991. His then attorney wrote to the Department three times in 1992 attempting to obtain a statement of reasons for the denial. Finally, in late April 1992, the Department's Deputy Director wrote back as follows:

> As you requested, I have reviewed the matter of Mr. Trantino's denial for halfway house placement.
>
> Your client was denied placement pursuant to *N.J.A.C.* 10A:20–4.2.

The cited regulation, it should be noted, is brief. It merely reposes in the Commissioner the power to designate an inmate's place of confinement and to transfer the place of assignment.

Trantino continued to seek halfway house placement, a matter of intensified importance in view of the December 1993 Board decision conditioning his release on obtaining such a placement. As noted by the majority opinion (opinion at 454, 687 *A.*2d at 284), his formal request of January 11, 1994, was denied on February 2, 1994, and the reasons for the denial were finally forthcoming in June 1995. In effect, the denial was based on an asserted concern for Trantino's personal safety generated by three anonymous letters and by concern for a "possible adverse community reaction"—this despite NJAC's expressed views some three years earlier regarding the availability of techniques both to protect Trantino and to deal with the community and despite NJAC's

expressed belief that those potential problems did not constitute a viable basis for refusing to accept Trantino into a halfway house program.

I come now to the April 26, 1995, decision, rendered after a May 1994 hearing held following Trantino's completion of his then FET. This decision is for the most part a verbatim repetition of the 1993 decision. Only the conclusion is modified. In its conclusion the Board acknowledged Trantino's "enormous progress toward reaching his full rehabilitative potential in the 30 years of his incarceration." It nevertheless denied parole and set another thirty-six month FET because Trantino could not recall the details of the grisly events of the 1963 murder, a matter I refer to again hereafter. It thus concluded that "[u]ntil and unless Mr. Trantino can completely, honestly, openly and consistently confront and fully admit his role in these murders, he can not be said to be completely and totally rehabilitated as per the Court's holding in the original Trantino decision." Of singular import is the Board's failure in this decision to refer to halfway house placement at all. Its recommendations were limited to continued "participation in supportive programs available within the institution to continue to better prepare himself for possible return to the community and thereby reduce the likelihood of return to criminal activity upon his release."

While Trantino's appeals to this court from the last two Board decisions were pending, Parole Board consideration continued. A hearing was conducted on September 14, 1995, by a two-member panel. That hearing focused mainly on the details of the crime and Trantino's ability to recall them as well as issues concerning his early childhood, television interviews, creative writing and painting, details of prior psychiatric reports, and reactions of magazine articles. The two-member panel recommended parole denial and once again the full Board considered the matter, rendering a formal decision on September 25, 1995. Again reiterating virtually verbatim the text of its earlier decisions respecting the background of the matter and the standard for decision

prescribed by the Supreme Court in 1982, the Board this time concluded that despite Trantino's "great strides ... towards achieving your rehabilitation potential over the course of the last thirty-two years," his inability to recall "certain details" regarding the murders in 1963 "is inhibiting you from reaching your rehabilitative potential." Thus, despite Trantino's repeated acceptance of responsibility for the crimes, the Board was nevertheless of the view that there was a substantial likelihood of commission of further crime on release "until you can remember specific events regarding the murder...." The Board further concluded that long term therapy was required, that a 36–month FET would be inadequate, and that a referral to a three-member panel to fix a longer FET was necessary.

The final act in this saga took place on May 20, 1996, when the Board issued its formal decision fixing a ten-year FET. After repeating the text of the three previous decisions, this one simply concluded that a "ten year future eligibility term is necessary in order to provide you with the opportunity to participate in appropriate psychological counseling to address your lack of responsibility and insight," assertedly demonstrated by inability of recall and inconsistent statements over the years regarding the events of 1963. That is the last of the Parole Board decisions now being appealed.

The foregoing chronicle demonstrates to me that the better Trantino does in the institutional setting, the worse he does with the Parole Board. As his own progress towards rehabilitation is acknowledged to have advanced, his opportunity for release has concomitantly declined. I cannot rationalize this phenomenon by any standard of reasonableness and fair play that I can envision. It bespeaks to me a decision that is grossly arbitrary and unreasonable.

I also believe that the administrative decisions appealed from do violence to the spirit and letter of the Supreme Court's 1982 decision which, of course, binds both the agencies and the lower courts. To begin with there is the question of the distinction

between 2A and 2C prisoners in terms of parole eligibility. The State has conceded to us on oral argument that once a 2A inmate has reached the Board-assigned future eligibility date, "new information"—obviously information counterindicating parole release—must be shown or the inmate must be released on parole. That is what *N.J.S.A.* 30:4–123.56 expressly requires in respect of 2C inmates. I acknowledge that the situation of 2A inmates is different. But I read the Supreme Court's 1982 opinion as making clear that even as to 2A inmates, the time must come when the standard of "no new information" will apply—that is, when the punitive aspects of the sentence as an independent consideration rather than as a component of the rehabilitative standard must be deemed to have been fulfilled and the inmate is presumptively parole eligible. It is also plain to me that the Parole Board and the Attorney General are in accord with that perception. Thus, as I review this record, I am persuaded that in 1982, when the Parole Board fixed a ten-year eligibility term, its expressed purpose was to set a limit on the punitive aspect of the sentence, placing the inmate, at the end of that period, in the same position as a 2C inmate is in when reaching parole eligibility. And if that is so, then there would, at least arguably, be a reasonable expectation of parole release at that time and a consequent liberty interest. *See N.J. Parole Bd. v. Byrne*, 93 *N.J.* 192, 460 *A.*2d 103 (1983).

I am also persuaded that that was a correct and reasonable interpretation of the Supreme Court's rationale and directive. There is little doubt in my mind that that is exactly what Chairman Dietz told Trantino in 1982, that is, if there were no new information, he would be parolable upon completion of the ten-year FET, i.e., that the presumption of *N.J.S.A.* 30:4–123.56 would then apply. I am also satisfied that the Board's 1988 denial of parole and our affirmance thereof were entirely consistent with that reading of the import of the 1982 opinion. That is to say, the Board in 1982 recommended substance-abuse counseling and psychiatric therapy. Trantino's refusal to engage in these programs

in the face of a strong Board recommendation was reasonably construable as constituting new and adverse information.

But what of the later denials? First, there is absolutely nothing I can find in any of the background material, including the professional evaluations through the years, reasonably supporting the conclusion that Trantino will commit another crime if he is released under appropriate monitoring conditions. Indeed, everything in this record is to the contrary. It therefore appears to me that despite the Board's continued acknowledgement in its formal decisions over the years that the punitive aspects of the sentence as an independent consideration are an interdicted consideration, it is only the punitive aspects of the sentence in that context that can account for its action. I can well understand and appreciate the perception that these crimes were so heinous that society's legitimate demand for retribution would be unforgivably frustrated by Trantino's release. But I do not believe that the applicability of that standard, that is, the independent punitive aspects of the sentence, is now open to debate. The Supreme Court has so declared and the Parole Board, *in haec verba,* has so acknowledged. The only relevant consideration at this juncture is the likelihood of recidivism as prognosticated by the inmate's demonstrated rehabilitation. As I read the Board's decisions and the background materials on which it successively relied, its repeated conclusionary litany asserting that that standard is still to be met is not sustainable. I find more telling its recitations that belie the mantra of a substantial likelihood of recidivism.

As I have noted, at this stage of the history of Trantino's confinement, the State has conceded that new adverse information bearing on the subject of rehabilitation is necessary in order for the most recent Parole Board action to be sustained. It argues that the Parole Board reasonably exercised its discretion in concluding that such new information had been demonstrated by the report of Dr. James Bell, its psychological consultant. It is the Board's exclusive reliance on Dr. Bell that convinces me of the essential arbitrariness of its action.

This is how I understand the Board's reasoning. In 1993, it had recommended transfer to a halfway house as a pre-release condition of defendant's parole. The Department of Corrections, in whose jurisdiction all prison assignments reside, refused to make that assignment. Because the assignment was not made and because it was of the view that defendant needs a period of intensive psychotherapy in lieu thereof, the Parole Board concluded that defendant should spend another ten years in incarceration to obtain that treatment, supposing, of course, that it is available to him in that setting.

What is the basis of this asserted need for another ten years of intensive psychotherapy? As I understand the Board's reasoning, it has concluded that defendant's rehabilitation cannot be complete until he remembers the details of his appalling, terrible crime. Although it apparently doubts the genuineness of what it terms his "selective recollection," there is nothing in over thirty years worth of psychological evaluations impugning the truth of defendant's inability fully to recall his participation in the nightmare of the Angel Lounge thirty-three years ago. There has been no challenge of his assertion, made thirty-three years ago and consistently since, that he was under the heavy influence of drugs and alcohol at the time, and his lack of full recall, asserted by him through the decades, is consistent with his trial testimony in 1964. It hardly qualifies as new information within the intendment of the Parole Act. This is particularly so in view of defendant's long-standing acceptance of responsibility for the crime and, even beyond remorse, his asserted disbelief that he ever could have been capable of so horrible a deed.

That brings us to Dr. Bell. The sole basis for the Board's action that I can see was its perception that defendant, in his interview with Dr. Bell, related some recollections that were inconsistent with his previous versions. First, I regard those excerpts as having been taken entirely out of context. The fact of the matter is that Dr. Bell strongly endorsed defendant's release on parole.

His confidential psychological evaluation submitted to the Board in July 1995 reported as follows:

> However, within the prison system, he has been an exemplary inmate and not only has invested in several program efforts to improve himself, but also has started several programs to assist youthful delinquent offenders and substance abusers.
>
> Clinically, he impresses as a man who has reached a point of change come about through sincere self-inventory and aspirations to atone for the great wrong he has done in his life. He has adequate mental and emotional resources to live a socially responsible, self-reliant life. His PASS Score of 66% suggests an above average chance of post-release success.
>
> DX: Anti–Social Character (301.70) Polysubstance Abuse (304.80)

. . . .

> PAROLE RECOMMENDATIONS: Urine Monitoring, NA, Supportive Counseling

When the Board interviewed him in December 1995, Dr. Bell had this to say:

> DR. BELL: He told me that day that he believed that his codefendant shot the victims—
>
> MR. SHUMAN: Did he—
>
> DR. BELL:—but that he couldn't recall that particular experience because he was so high on drugs and alcohol that it was kind of like a fog to him and that he may have, in fact, been hallucinating as well. So, he wasn't sure what was real and what wasn't real from that particular event.
>
> He said he clearly recalled fistfighting with one of the victims and at one point having a gun in his hand. But, he does not recall discharging it and thinks he left the bar before he discharged any weapon.
>
> MR. SHUMAN: Okay.
>
> DR. BELL: That's what he told me in that particular interview. I'm aware that there are other interviews in which he may recount that a little differently.

Apparently, Dr. Bell's note that in other interviews defendant "may recount that a little differently" together with Trantino's asserted inability to recall the specific details of the shootings constitutes the essential basis of the "new information" that resulted in the ten-year future eligibility date. In my view it simply cannot qualify as such.

The Board also had the benefit of a January 1996 interview with Dr. Glenn Ferguson, who opined in part that

after so long of an incarceration that institutional mind-set kind of sinks in and is ingrained and it, you know, the chances of independent thinking and functioning is like out the window.

And that was one of the things that I was really kind of surprised in my interview and my evaluation with Mr. Trantino was that was not the impression I got. You know, whether or not that's true is another question. But from what I gathered, he didn't have that same institutionalized mind-set that you see in those long extended incarcerations.

And again, I think that support system that he's developed is at least partly responsible for that. He's definitely made some connections in the community and he even functions in the institution more like a staff member than an inmate. And that—I think anybody that you talk to in any of the institutions that he's been in will confirm that. I mean, he's basically functioning like a staff member.

Dr. Ferguson was of the view that defendant would succeed on parole with suitable conditions including, preferably but not necessarily, a halfway-house placement. The desirability of a halfway-house placement, either before or after parole release, has been a continuous theme of defendant's parole consideration through the years. If the Department of Corrections refuses to make that assignment on a pre-release basis, it is my view that the Parole Board should consider such a post-release placement, in or out of the State, or conditions in lieu thereof as a post-release condition.

There are other things that must be said. Defendant was convicted on a one-count indictment even though there were two murders. Accordingly, when his originally imposed death sentence was modified to life imprisonment, only one life term was imposed and only one could have been imposed. Had defendant been convicted of first-degree murder after adoption of the Criminal Code and had his life been spared by the jury after trial, he would have been subject to a minimum parole ineligibility period of thirty years.[5] He has already served thirty-three. I do not

---

[5] I am aware that prior to its 1982 amendment, N.J.S.A. 2C:11–3b prescribed a minimum parole ineligibility period of fifteen years, but, in the case of an extended sentence, twenty-five years. See, e.g., Trantino, supra, 89 N.J. at 375 n. 9, 446 A.2d 104. I am also aware that shortly before the argument of this appeal, N.J.S.A. 2C:11–3b was again amended by L. 1996, c. 115, to provide that when the victim of a first-degree murder is a police officer killed while performing his

believe that defendant can be kept incarcerated indefinitely only because people outside the correctional system insist that he remain there. After all, the entire parole process is predicated on the belief in the potential for rehabilitation and redeemability of all people. Even Thomas Trantino. I recognize the deference we are obliged to accord Parole Board decisions. The Parole Board, nevertheless, is obliged to exercise a fair, reasonable, and above all, independent judgment as to whether the punitive aspects of defendant's life sentence, as defined by the Supreme Court, in rehabilitation terms, have been fulfilled. *See, e.g., N.J. State Parole Bd. v. Cestari,* 224 *N.J.Super.* 534, 540 *A.*2d 1334 (App. Div.), *certif. denied,* 111 *N.J.* 649, 546 *A.*2d 558 (1988). I am constrained to conclude that that has not been the case here. Its decision, in my view, was arbitrary, unreasonable and unsupported by the record. Again, I hold no brief for Thomas Trantino. My brief is for the legal process.

I am satisfied that the record supports the administrative determination that a pre-release halfway house placement preparatory to Trantino's parole would be the optimum disposition. I believe that the Department acted arbitrarily in denying that placement and, as I have indicated, I would order it to effect that placement now either in the State or as it had earlier planned, outside the State following a period of in-custody evaluation by another prison system. If the Department were to do so on a timely basis, I believe that that action would effectively moot the Parole Board's subsequent actions. If it were not to do so on a timely basis, I would reverse the Parole Board's most recent denial of parole accompanied by the ten-year FET and direct it to fix conditions of parole that would most nearly approximate pre-release placement, including a post-release placement, intensive supervision, substance abuse counseling and psychotherapy and such other conditions as would permit the Parole Board cautiously to scrutinize Trantino's post-release adjustment and behavior.

official duties, there shall be no parole eligibility at all. That amendment is, of course, inapplicable here by reason of *ex post facto* constraints.

I would reverse and remand in accordance with this dissenting opinion.

HUMPHREYS, J.A.D. (concurring).

I concur in the result substantially for the reasons in Judge Stern's comprehensive opinion. I write separately to express my conviction that the Parole Board's decision to deny parole to Thomas Trantino was the correct decision, correctly arrived at in accordance with law and due process. I disagree with my dissenting colleague's view that the citizens who comprise the New Jersey State Parole Board have in "every adverse administrative decision" since 1990 violated their public duty and because of public outrage and political pressure, denied parole to a criminal who merits it.

I

The Supreme Court in its 1982 decision laid down specific guidelines for the Parole Board to follow in determining whether Trantino should be paroled. The Court said the Parole Board:

must determine if the punitive aspects of Trantino's sentence have been satisfied such that he is truly rehabilitated and is not likely to commit crimes in the future. On this point—the sufficiency of punishment—the Parole Board may consider the kind of sentence that the inmate would likely have received under the present Code of Criminal Justice for the crimes which he committed. If the Board determines that Trantino has not been punished sufficiently and, for that reason, *as well as any others*, it might appear by a preponderance of the evidence that there is a substantial likelihood of future criminal activity if he is released, the Parole Board *must deny* Trantino parole.

[*In re Trantino Parole Application*, 89 *N.J.* 347, 377, 446 *A.2d* 104 (1982) (emphasis added).]

My review of this voluminous record satisfies me that the Parole Board has made a conscientious effort to comply with the above mandate of the Supreme Court. We should not lightly assume that public officials have year after year forsaken their oath of office. On the contrary, decisions and actions of public officials are presumed to be valid. *See Levin v. Township Committee*, 57

*N.J.* 506, 537, 274 *A.*2d 1 (1971); *In re D.J.M.,* 158 *N.J.Super.* 497, 501, 386 *A.*2d 870 (App.Div.1978).

We should also recognize that parole decisions are often not easy to make. Determining in this case whether "the punitive aspects of Trantino's sentence have been satisfied such that he is not likely to commit crimes in the future" is far from an exact science. This is especially true in the case of criminals such as Trantino who have been sentenced to life imprisonment for committing particularly heinous crimes. It is easy to say that such a criminal has been rehabilitated in prison and may safely be released. However, this is only a prediction. If the prediction proves wrong, the public is placed in grave danger.

Further, the Board's decision must be considered in the context of Trantino's crimes. He was convicted of murdering two police officers after first torturing and humiliating them. *See In re Trantino, supra,* 89 *N.J.* at 352, 446 *A.*2d 104. The murders "were particularly brutal in that the two officers were forced to strip partially, pistol-whipped into near unconsciousness and then, despite their desperate pleas to be spared, repeatedly shot." *Ibid.* The Court described the murders as "particularly heinous," and "as cold-bloodedly vicious and wantonly brutal as other notorious capital cases." *Id.* at 374, 446 *A.*2d 104.

One of Trantino's victims was the father of three children. The other victim was a young police officer trainee who was about to embark on a career as a police officer.

The murders were not a one-time drug induced act by an otherwise law abiding citizen. The murders occurred in the wake of an armed robbery committed by Trantino and an accomplice on two elderly women in their home. When the murders occurred, the two criminals were "celebrating the success of their criminal exploits in a Lodi nightclub...." *Id.* at 352, 446 *A.*2d 104.

Trantino's crimes strike at the vitals of public safety. His murders merited then and now the penalty of death or a life in prison.

Trantino's background does not augur well for his ability to live a crime-free life if released on parole. Although a young man at the time he murdered the police officers, he had already accumulated a substantial offense history. He had just been released on parole from a lengthy sentence for robbery. His record and background are those of a street thug who preys on the weak and helpless. To release such a person to the community is an awesome decision fraught with danger.

## II

Furthermore, Trantino's assertion that he must be released now must be weighed in the light of basic legal principles. First, Trantino has no federal "constitutional or inherent right" to be released before the expiration of his life sentence. *See Connecticut Board of Pardons v. Dumschat,* 452 *U.S.* 458, 464, 101 *S.Ct.* 2460, 2464, 69 *L. Ed.*2d 158, 164 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 *U.S.* 1, 7, 99 *S.Ct.* 2100, 2104, 60 *L. Ed.*2d 668, 675 (1979). "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.... That the State holds out the *possibility* of parole provides no more than a mere hope that the benefit will be obtained." *Greenholtz, supra,* 442 *U.S.* at 7, 11, 99 *S.Ct.* at 2104, 2105, 60 *L. Ed.*2d at 675, 677–78 (emphasis added).

Nor is there anything in the New Jersey Constitution which gives a prison inmate a right to be paroled. *New Jersey State Parole Board v. Byrne,* 93 *N.J.* 192, 208, 460 *A.*2d 103 (1983). "Parole is not a constitutional right but an act of leniency or grace and a device for the protection of society through the rehabilitation of the offender." *In re Trantino, supra,* 89 *N.J.* at 363 n. 5, 446 *A.*2d 104 (quoting *State v. Davis,* 175 *N.J.Super.* 130, 145, 417 *A.*2d 1075 (App.Div.) *certif. denied,* 85 *N.J.* 136, 425 *A.*2d 291 (1980)). Similarly, Trantino does not have any constitutional right to be transferred to a halfway house. *See Connecticut Board of Pardons v. Dumschat, supra,* 452 *U.S.* at 465, 101 *S.Ct.* at 2464, 69 *L. Ed.*2d at 165; *Greenholtz, supra,* 442 *U.S.* at 11, 99 *S.Ct.* at

2105, 60 *L. Ed.*2d at 677–78; *Meachum v. Fano,* 427 *U.S.* 215, 228, 96 *S.Ct.* 2532, 2540, 49 *L.Ed.*2d 451, 461 (1976).

In exercising its sensitive and extremely important authority, the Parole Board is vested with broad discretionary powers. *Monks v. New Jersey State Parole Board,* 58 *N.J.* 238, 242, 277 *A.*2d 193 (1971). Parole Board determinations "unlike the determinations of the usual administrative agencies" are "impregnated with highly predictive and individualized discretionary appraisals." *Beckworth v. New Jersey State Parole Board,* 62 *N.J.* 348, 359, 301 *A.*2d 727 (1973). The Parole Board is "expressly charged by the Legislature to withhold release when it does not have the opinion that there is reasonable probability that the inmate will be law abiding. . . ." *Id.* at 360, 301 *A.*2d 727.

Judicial review of a Parole Board decision is quite limited. As stated by Judge, later Justice, William Brennan, Jr., "[t]he grant or denial of parole is a matter for the exercise of proper judgment by the paroling authority and *is not in any way a judicial function.* Judicial review of an action such as that before us here is limited essentially to a determination whether it was taken within the statutory powers of the parole authority, properly applied." *White v. Parole Board,* 17 *N.J.Super.* 580, 586, 86 *A.*2d 422 (App.Div.1952) (citations omitted) (emphasis added).

The limited nature of judicial review of parole decisions is emphasized by the fact that in only two of the fifty-nine reported decisions in this State in the last half century, has the Court ordered, as the dissent would do, the release of a criminal because the Court disagreed with the Parole Board's decision on the merits. *See New Jersey State Parole Board v. Cestari,* 224 *N.J.Super.* 534, 540 *A.*2d 1334 (App.Div.), *certif. denied,* 111 *N.J.* 649, 546 *A.*2d 558 (1988); *Mallamaci v. Dietz,* 146 *N.J.Super.* 15, 368 *A.*2d 947 (App.Div.1976). One of the decisions, *Cestari, supra,* involved a post-Code inmate who had previously "led a completely law abiding life." 224 *N.J.Super.* at 538, 540 *A.*2d 1334. In the other, *Mallamaci, supra,* the inmate had been prematurely paroled because of a clerical error. After spending seven months on

parole without incident, he was returned to prison. The court found that under these and other circumstances, his parole should not have been revoked. *Mallamaci, supra,* 146 *N.J.Super.* at 22, 368 *A.*2d 947.

Neither of these cases bears any resemblance to the issue before us, whether to overturn the Parole Board's decision not to parole a criminal who is serving a life sentence for murdering two police officers.

The circumspection with which the judiciary approaches parole decisions is exemplified by the leading case of *Beckworth, supra,* 62 *N.J.* at 348, 301 *A.*2d 727. In *Beckworth,* the inmate was serving a fifteen to twenty year sentence for murder. He was repeatedly denied parole despite his contention that he had an "excellent institutional adjustment." The Parole Board said that it was unable to find a reasonable probability that if the inmate were released on parole, he would assume his proper and rightful place in society without violating the law.

The Supreme Court upheld the Parole Board's decision. The Court said "we are in no position whatever (sic) to say that it should have made such finding or that his denial of parole was in any sense arbitrary or an abuse of its broad discretion." *Id.* at 354, 301 *A.*2d 727. Justice Sullivan, in his concurring opinion in *Beckworth,* said that "judicial review of Parole Board matters is limited to a consideration of whether guidelines and principles have been substantially satisfied, and ordinarily will not involve the review of the merits of the Parole Board decision." *Id.* at 368, 301 *A.*2d 727 (Sullivan, J., concurring).

The dissent points to Trantino's recent progress in prison as grounds for his release. However, the apparent rehabilitation of a prison inmate does not mean that the inmate *must* be released on parole. Punishment is an important aspect of the criminal law. As stated by the New Jersey Supreme Court:

[p]unishment serves broad societal purposes and needs relating to general deterrence, which entails deterring other persons from committing crimes. Punishment also serves the ends of individual deterrence, which entails dissuading the individu-

al offender from committing future crimes. In this respect, the punitive aspect of a sentence is relevant to rehabilitation in the sense that it tends to ensure that the individual inmate will not be likely to commit future crimes.... Punishment and rehabilitation are not antagonists.

[*In re Trantino, supra,* 89 *N.J.* at 371, 446 *A.*2d 104 (citations omitted).]

In *In re Trantino, supra,* the Court cited *State v. Lancaster,* 550 *P.*2d 1257, 1259 (Alaska 1976), for the proposition that

the fact that a criminal should be rehabilitated, if possible, does not mean that he should escape punishment for his misdeeds. The very opposite may be true. Penalties must be imposed in most instances, in order to make rehabilitation effective, as well as to protect the public and deter others from engaging in criminal conduct.

[89 *N.J.* at 372, 446 *A.*2d 104.]

Consequently, the punitive aspects of a pre-Code inmate's sentence are "extremely relevant in terms of the inmate's rehabilitation." *Id.* at 372–73, 446 *A.*2d 104. While the Parole Board in dealing with pre-Code sentences of criminals such as Trantino

may not determine parole release or fitness solely on grounds of the adequacy of the punishment reflected in the inmate's prison term, the Board must consider whether the punitive aspects of the sentence have been satisfied in terms of the rehabilitative potential of the inmate. Thus, on remand in this case, the Board must reassess the punitive aspects of Trantino's sentence in considering the extent of his rehabilitation and his fitness for parole.

[*Id.* at 373, 446 *A.*2d 104.]

Additionally, the gravity of Trantino's underlying crimes is "the main factor that creates a need for punishment." Although it may not be the "sole" reason for continuing punishment and denying parole, "the Parole Board must nevertheless weigh the seriousness of the crime as an element in determining whether the extent of his punishment has been adequate to insure his individual progress toward rehabilitation." *Id.* at 373–74, 446 *A.*2d 104.

Further, "in considering Trantino's fitness for parole and release, the egregiousness of his crime and the harsh sentence imposed obligate the Parole Board to weigh most scrupulously and conscientiously whether Trantino has been punished sufficiently for it to conclude *with confidence* that he has been rehabilitated

and will not commit future crimes." *In re Trantino, supra,* 89 *N.J.* at 374, 446 *A.*2d 104 (emphasis added).

In making its parole decision, the Parole Board may consider the current penalties for Trantino's crimes:

[o]n this point—the sufficiency of punishment—the Parole Board *may consider the kind of sentence that the inmate would likely have received under the present Code of Criminal Justice for the crimes which he committed.* If the Board determines that Trantino has not been punished sufficiently and, for that reason, as well as any others; *it appears by a preponderance of the evidence* that there is a substantial likelihood of future criminal activity if he is released, the Parole Board *must deny* Trantino parole.

[*Id.* at 377, 446 *A.*2d 104 (emphasis added).]

The Supreme Court noted that under the Code,

since Trantino was guilty of two murders, he might also have received a second sentence, to run consecutively, of either life imprisonment or 30 years with a minimum term of 15 years before becoming parole eligible. Thus, if he had been sentenced under the code, Trantino might have had to stay in prison for 40 or perhaps even 50 years before he would become eligible for parole.

[*Id.* at 375 n. 9, 446 *A.*2d 104.]

Today, the sentence that Trantino would receive would be even more severe. If Trantino had committed the murders after the 1982 amendment of the Code, *see Laws of New Jersey, 1982,* ch. 111, § 1, and escaped the death penalty, he would likely have received two consecutive life sentences carrying a parole ineligibility of a minimum of sixty years. If today he murdered *one* police officer and was not sentenced to death, his minimum sentence would be imprisonment for life without parole. *See Law Enforcement Officers' Protection Act, 1996 N.J. Sess. Law Serv.* 115 (West) (amending *N.J.S.A.* 2C:11–3). Moreover, criminals who have committed lesser crimes than murder may be sentenced under current law to life imprisonment without parole under the *Persistent Offenders Accountability Act* (commonly referred to as the "Three Strikes and You're In Act"). *N.J.S.A.* 2C:43–7.1(a).

Thus, putting this matter in proper perspective, Trantino, a cruel murderer of two police officers, was sentenced to life imprisonment. He is demanding parole release after thirty-three years in prison. Criminals who have committed much less serious

crimes will be spending their entire lives in prison. The Parole Board is entitled to give these facts significant weight in reaching a decision.

## III

I do not agree with my dissenting colleague that an inmate sentenced under the pre-Code statute must be paroled when the inmate has reached the assigned parole eligibility date unless "new information" is presented to the Parole Board. The Supreme Court in *In re Trantino, supra,* said that the difference between pre-Code inmates, such as Trantino, and post-Code inmates was "glaringly apparent" because:

> inmates serving sentences under the Code—post-Code inmates—will have presumptively satisfied all punitive aspects of their sentences at the time they became eligible for parole. This is not true of pre-Code inmates. The punitive aspects of their sentences will not necessarily have been fulfilled by the time parole eligibility has occurred.
>
> [*Id.* at 369–70, 446 A.2d 104.]

Consequently, the Supreme Court held that the Parole Board must decide a pre-Code inmate's fitness for parole by determining whether the punitive aspects of the inmate's sentence have been satisfied "such that he is truly rehabilitated and is not likely to commit crimes in the future." *Id.* at 377, 446 A.2d 104. The view of the dissent, arguably supported by one sentence in the State's reply brief, is fundamentally inconsistent with the Supreme Court's decision in *In re Trantino.* Consider the following example. Assume that the Parole Board is deciding whether to parole a pre-Code inmate on his eligibility date and no "new information" has been supplied. Assume further that the Parole Board is fully satisfied that the punitive aspects of this inmate's sentence have not been satisfied, that the inmate has not been rehabilitated and that if released, the inmate is likely to commit future crimes. Under the dissent's view, the Parole Board apparently must release this inmate. I find nothing in the Supreme Court's 1982 decision in *In re Trantino* which even hints that such a grotesque

result would be countenanced. Nor can I glean any intention on the part of the Legislature to so tie the Parole Board's hands.

The mischief in the dissent's construction of the statute extends beyond this case. The State says that there are approximately ten inmates convicted of first degree murder who are presently serving similar sentences in the New Jersey prison system. Under the dissent's construction of the statute, these ten inmates, assuming no new information, apparently must be paroled when they reach their parole eligibility dates regardless of the danger they may pose to public safety. Indeed, under the dissent's view of the statute, they may be entitled to release now on the ground that they should have been paroled at an earlier eligibility date.

Statutes are to be read "sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.'" *Schierstead v. City of Brigantine,* 29 *N.J.* 220, 230, 148 *A.*2d 591 (1959). Where a "literal reading of the statute leads to absurd consequences 'the court must restrain the words' and seek the true legislative intent." *Id.* at 231, 148 *A.*2d 591; *see also Roig v. Kelsey,* 135 *N.J.* 500, 515, 641 *A.*2d 248 (1994) (ascertaining legislative intent is the paramount judicial goal; once determined, legislative intent overrides any literal reading of a statute).

A sensible construction of *N.J.S.A.* 30:4–123.53 is that the statute applies only to post-Code inmates. The punitive aspects of the sentences of these inmates, as the Supreme Court said in *In re Trantino, supra,* have been determined by the sentencing court; hence these inmates are entitled to parole in the absence of new information. This section of the statute was not, however, intended to give, in the absence of new information, those inmates sentenced prior to the Code a free "get out of jail" card when they become parole eligible upon serving the customary one-fifth of their sentence. This sensible construction avoids absurdities, is consistent with the decision in *In re Trantino, supra,* and is consonant with reason and good discretion.

In any event, new information was presented to the Parole Board as set forth in Judge Stern's opinion. (Majority, pp. 466–467, 687 *A*.2d at p. 291). As Judge Stern points out, the Board's conclusions are supported by psychological reports and by Trantino's shifting position on what happened that dreadful night at the Lodi nightclub.

Additional support for the Board's views on Trantino's eclectic memory can be found in the 1985 decision of United States District Court Judge Frederick Lacey. He found after an evidentiary hearing that:

> Trantino has maintained at various times either: that he cannot at all recall the crime, or that he remembers he "did not kill the policemen" and is "innocent" because he left the bar before the murders, or most recently at the *habeas* hearing, that he has some "doubt" of his self-proclaimed innocence.
>
> [*United States ex rel. Trantino v. O'Lone*, Civ. 84–2828 at 30 (D.N.J. May 31, 1985).]

Trantino's present position appears to be that either Falco, not he, shot the police officers, (Majority, p. 441, 687 *A*.2d at p. 276), or that he must have killed the police officers because the witnesses said he did and, therefore, he will not argue the issue any more. The Parole Board is entitled to question the genuineness of Trantino's present equivocal position and factor that doubt into its decision as to whether Trantino needs further intensive psychotherapy. The Board is also entitled to consider the many warnings contained in psychological reports. (*See infra* p. 500, 687 *A*.2d at p. 309).

## IV

The record clearly demonstrates the soundness of the Parole Board's decision to deny parole to Trantino. The Parole Board was specifically directed by the Supreme Court in Trantino's case "to seek affirmatively all relevant evidence and to permit the participation of interested parties, subject to procedural regulations designed to control and direct the parole proceedings properly." *In re Trantino, supra*, 89 *N.J.* at 377, 446 *A*.2d 104. The Parole Board did just that.

The Parole Board was told by the Supreme Court that it must deny parole to Trantino unless it could conclude "with confidence" that he had been punished sufficiently so that he has been "truly rehabilitated" and will not commit future crimes. *In re Trantino, supra,* 89 *N.J.* at 374, 377, 446 *A.2d* 104. If it appeared that Trantino had not been punished sufficiently and for that reason "as well as any others" that there was a substantial likelihood of future criminal activity, the Supreme Court said that the Parole Board "must deny" Trantino's parole. *Id.* at 377, 446 *A.2d* 104.

After a thorough study, ample consideration, and in a comprehensive and reasoned decision, the Board denied parole to Trantino, an inmate who had committed particularly heinous crimes. The Board reasonably concluded that in the absence of further intensive psychiatric therapy it could not determine that Trantino had achieved his rehabilitative potential so that the Board could conclude with confidence that he had been rehabilitated and would not commit future crimes.

Further support for these conclusions is found in various psychological reports. For example, Trantino's "fundamental personality is of a narcissistic and anti-social type, and this will likely remain unchanged throughout his life." (1992 report). If Trantino were paroled and there is a "weakening in the support network" or he were to "relapse into substance abuse, [this] could lead to disastrous results." (1991 report). Trantino will "always be at some risk for impulsive or violent behaviour" (1991 report). If he was in a "depressed and hopeless mood," was "drinking to excess," had "access to a weapon" and was "confronted by someone in an insulting or rejecting way, his potential for violence could be considered quite high." (1991 report). Trantino's chances of leading a crime free life if paroled are "fair," (1991 report), or "fair to good." (1990 report). Continued psychotherapy is recommended to "address issues of conflict resolution, anxiety and depression," (1995 report).

The Board's decision to deny parole reached after thorough review and consideration is one to which the judiciary should pay

great deference. Parole Boards, not judges, are vested with discretion to release criminals from prison before completion of their sentence. The Parole Board's decision to deny parole to this murderer was well based and was not arbitrary, capricious or unreasonable.